Burroughs *vs.* Gaither.

(Decided 10th December, 1886.)

---

CAROLINE S. BURROUGHS, and others *vs.* THOMAS H. GAITHER.

*Trust estate—Sale of Trust property for Payment of Taxes— Power of Court of Equity to Mortgage Trust estate to Redeem it from Tax sale—Equity practice—Usury—Appeal.*

Where a testator devises all his real and personal estate to his only son and child, in trust, to apply the entire income to the "maintenance, education and advancement" of his children, until the youngest child attains the age of twenty-one years, and a Court of equity upon assuming control of the trust, finds that the real estate, constituting nearly the entire trust property, has been sold for

taxes for a sum merely nominal in comparison with its value, and that the title to it was about to pass to strangers, the effect of which would be to break up the trust, it becomes its duty to act at once for the benefit of the *cestuis que trust*, and take advantage of the privilege of redemption secured by the tax laws; and where there are no other means of raising the necessary funds, the Court has the power to sell or mortgage a part of the trust estate in order to rescue the whole, or as much of it as possible, from the impending *vis major*.

In such an emergency, the Court managing the trust estate in the interest of the *cestuis que trust*, and for their benefit, is clothed with all the powers of absolute ownership; and having such may exercise them through the agency of its receivers.

Where trust property has been sold for the payment of taxes, and the time within which a redemption could be had, had nearly expired, a Court of equity, having taken charge of the property, and appointed a receiver, may properly pass an order authorizing the receiver to mortgage a portion of the estate to raise a fund with which to redeem, without first giving notice to the *cestuis que trust*.

Where a Court of equity acting in behalf of *cestuis que trust*, and for their benefit, has authorized a receiver to mortgage the trust property to raise money to redeem the same from a tax sale, and has formally approved the mortgage and the terms of the loan, as reported to the Court, the *cestuis que trust* will not be heard to question the validity of the mortgage by interposing the objection that the mortgagee exacted usury from them.

An order directing the defendants or some of them to bring the money due on a mortgage into Court, on or before a given day, " otherwise a decree will be passed " for a sale of the mortgaged premises, is not an absolute order for the payment of money, nor an order determining a question of right between the parties and directing an account to be stated on the principles of such determination, and no appeal will lie therefrom.

APPEAL from the Circuit Court for Prince George's County, in Equity.

The record in this case, is quite voluminous and contains much that has no bearing upon the questions which the present appeal presents for review, and only such of the facts and proceedings as bear upon those questions need be stated.

The record shows that Richard D. Burroughs died in 1870, leaving a will by which he devised all his real and personal estates to his only son and child, John W. Burroughs, to hold the same "*in trust* for the children of my said son and Mary E., his wife, now living or that may hereafter be born." He then devised "all the rents, issues and profits of my said real and personal estates to my said son, to be disposed of as he may think proper, for the maintenance, education and advancement of his children now or hereafter to be born," and then directed that when the youngest child of said son should arrive "at the age of twenty-one years, then all my estates, both real and personal, devised in trust as aforesaid, shall be equally divided among them, in fee simple, share and share alike;" and he appointed his said son his executor. The will which was executed in 1861 also contained a clause to the effect that his son should "not be responsible to his said children for the principal or interest of the said rents, issues and profits;" but by a codicil executed in October, 1870, shortly before his death, the testator revoked this clause, and expressly declared that his son "shall be held responsible and legally bound to his children for the rents, issues and profits of my estate, real and personal, devised to him under the provisions of my said will, and to be disposed of and appropriated as thereby directed." The will also gave a legacy of $1000 to a niece of the testator. The children of the trustee are seven in number, three sons and four daughters. The real estate was a large farm in Prince George's County, containing about eight hundred and thirty-nine acres, with a dwelling house and all the usual and necessary farm buildings thereon; and the personalty consisted of the furniture in the house, and the stock, crops and farming implements, upon and used in the cultivation of the farm. It is not clearly shown what was the value of the entire property, but it appears to have been assessed for the purpose of taxation at $20,010, and

of this sum, as may be inferred from what is stated in the record, at least $15,000, or $18,000, is represented by the real estate.

The trustee took possession of the property both as trustee and executor, but did nothing in the latter capacity except to return an inventory of the personal estate to the Orphans' Court, nor did he take any steps in either capacity to invoke the aid of the Court of equity until the 25th of September, 1876. On that day he filed a bill as executor, in which, among other things, he charged that the testator left debts to a considerable amount; that the personal estate was of small value, and insufficient to pay these debts and the legacy of $1000, and he had paid the same out of his own private funds; that for the sums so paid and his commissions as executor (amounting in all to $4115.52) he was entitled to be reimbursed out of the estate of the testator. The bill then prays that a decree may be passed, appointing a trustee with power to sell or mortgage a part of the real estate in order to raise a sum sufficient to pay this claim of the complainant, and for general relief.

All the children were made parties to this bill, and were all summoned except one, who afterwards appeared by counsel, but no answers were filed until the 21st of June, 1879, when Catharine, the eldest daughter, who was then of age, filed her answer, and on the same day upon leave granted, filed a cross-bill, in which she charged her father, the trustee, with gross mismanagement of the estate, and among other matters averred that the taxes thereon since the year 1873, had not been paid, and that the property had been, on the 5th of April, 1879, sold to pay the same, for the sum of $1754.91, and that proceedings are now pending for the confirmation of that sale. The bill prays for an account from the trustee, for an injunction restraining him from committing waste, and from disposing of the crops, for his removal and the appoint-

ment of another trustee in his place, and for the appointment of a receiver, in the meantime, to collect the rents and profits, and to dispose of the crops for the purpose of paying the accruing taxes, and redeeming the property from the tax sale already made. The injunction was granted as prayed, and the motion for a receiver set down for hearing.

To this cross-bill all the other children, as well as the trustee, were made defendants. Those of the children who were minors filed a formal answer by their guardian *ad litem*, and two of them who were then adults, answered admitting the averments of the bill to be true. The trustee in his answer denied the material allegations of the bill, averred that he had applied the income of the property in accordance with the terms of the trust, and explained at length his application of the same, as well as the condition of the property itself. He admits however that the whole real estate had been sold for taxes as stated in the bill, and averred that it was bid in at the sale, in the name of "Samuel C. Busey and James H. Saville, trustees of Mary E. Burroughs," the wife of this defendant, that this sale had been reported to, and *ratified* by the Court, but he has no information upon what trusts the property was bought or is proposed to be held by said trustees."

The motion for the appointment of a receiver was heard, after all the parties in interest had thus been brought before the Court, and had answered the cross-bill. The Court in its opinion, declined, for reasons stated, to remove the trustee, but by an order filed on the 19th of January, 1880, appointed two "receivers, with full power, and authority to take possession of the said estate, real and personal, and to manage the same under the direction of the Court, from time to time to sell and dispose of the crops raised and to be raised upon the said real estate, and to receive all other the income, rents, issues and profits of the said estates, and to hold and apply the

same under the directions and orders of this Court, and to account therefor from time to time at least yearly, or oftener if required by the Court."

The receivers gave bond, and on the 29th of January, 1880, filed a petition in the case setting out that it was indispensably necessary for the continuance of the trust and the preservation of the trust property, that the real estate should be redeemed from the tax sale, that they had no means in hand with which to redeem it, and that the time for redemption would expire on the 5th of April, following, and they therefore asked the Court to give them authority to sell or mortgage a portion of the real estate, in order to raise a fund for that purpose. On this petition, the Court on the same day passed an order empowering them in their discretion to sell or mortgage a part of the real estate, in order to redeem the whole from this tax sale, and in case they determined to mortgage they were authorized to raise a sum sufficient "to redeem the said lands from the said taxes, and to pay the expenses attending the negotiation of said mortgage, and upon receipt of the money to execute a good and sufficient deed of mortgage, for the purpose of securing the money borrowed and the interest to accrue thereon."

Acting under this authority the receivers negotiated a loan from Mr. R. W. Templeman for three years, and gave him a mortgage for $2600 on part of the real estate, consisting of four hundred and fifty nine acres. The mortgage bears date the 18th of March, 1880. It refers to and recites the order of Court which gave the receivers their authority to act, and contains the conditions and covenants usual in mortgages executed under Article 64 of the Code. Templeman afterwards assigned the mortgage to Mr. Thomas H. Gaither. The receivers made their report on the 13th of April, 1880, and after stating fully the execution of the mortgage and the terms and rate of interest (seven per cent.) upon which the loan was made, they submit

as part of their report, a statement that they had received from Templeman, the mortgagee, the net sum of $2423.10 and had left in his hands $176.90, which consisted of premium, commissions, fees, and other expenses attending the negotiation of the mortgage. They then state that of the sum received they had applied $2012, being the amount for which the property was sold at the tax sale, with fifteen per cent. interest thereon, as required by the tax laws, to the credit of the tax sale case, that they had paid $41 premium for insurance as required by a covenant to that effect in the mortgage, and $183 for the unpaid taxes for the year 1879, and that there was left the sum of $187.10 in their hands, unexpended.

On the 29th of April, 1880, one of the daughters moved the Court to vacate the order of the 29th of January, 1880, upon the grounds, 1st, that it was obtained without any notice to the parties interested; and 2nd, that it was unnecessary because the parties who bid in the property at the tax sale, " would have willingly quit-claimed, and conveyed all the interest they might have acquired by said tax sale, for the benefit of the children interested." No action appears to have been taken upon this motion, though the receivers in their report referred to it, and requested the Court to direct them whether they should resist it.

On the 6th of March, 1883, when the mortgage was about to mature, the receivers filed another petition. In this they refer to their report of the 13th of April, 1880, and make it part of their present petition. They state that the amount about to become due was the principal sum of $2600 for which the mortgage was given, and the last semi-annual interest note, and that they had no funds of the estate wherewith to pay this debt. They therefore asked the Court to pass an order authorizing them to renew the mortgage, or to raise by a new mortgage on the same property " a sum sufficient to pay the said mortgage

debt and interest, and to cover the expenses of the said renewal or negotiation of a new mortgage ; " and the Court on the same day passed an order authorizing them "to execute a new mortgage of the same land to pay the said mortgage debt and interest, and the commissions and expenses of negotiating the said mortgage." No appeal was ever taken from this order by any of the parties in interest. The receivers thereupon obtained from Gaither, the assignee of the mortgage, an agreement in writing "to extend the payment of the said mortgage debt for the period of three years from the 18th of March, 1883, in consideration that the receivers have executed six semi-annual interest notes for the interest to become due on the said mortgage debt during the said period of extension, and in further consideration that the said receivers have agreed to pay the said Richard W. Templeman, his agent, two and one-half per cent. commissions, viz., the sum of $65 for said renewal." This agreement was also signed by Templeman, and was reported to the Court by the receivers in a report make on the 6th of February, 1884.

On the last mentioned day the receivers also made another report, accompanied by an account in which they set out at length how they had managed and applied the income of the trust estate, and the then condition of the property. In this report they ask that their commissions as receivers may be fixed and allowed, and again refer to the mortgage and its renewal, and ask to be allowed proper compensation for their services in this matter, as well as the expenses of one of them, incurred in visiting Baltimore on this business. They suggest that certain woodland, or the timber therefrom, should be sold to pay this mortgage debt, and further state that out of the proceeds of the original loan they had retained $187.10, "as a fee for their services in filing the petition and procuring the order to negotiate the said mortgage loan, and in negotiating the same and disbursing the proceeds of said loan."

On this report the Court passed an order referring the same to the auditor with directions to examine and report upon the account which accompanied it. By this order also the Court fixed the commissions to be allowed the receivers, and directed "that they be allowed the sum of $187.10" for the services specified in their report, and also "a fee of $50 for their services in procuring a renewal of the said mortgage loan," and $4 for the expenses of one of them (Mr. Chew) in visiting Baltimore on this business. The suggestion as to a sale of part of the real estate for the purpose of paying the mortgage, was reserved for the further action of the Court. No appeal was taken from this order.

John W. Burroughs, the trustee, died in November, 1884, and the Court, on the 4th of August, 1885, appointed Mary E. Burroughs, his widow, and the mother of the *cestuis que trust*, trustee in his place. This appointment was made upon the application of the eldest daughter and her husband, and with the assent of all the other children. At this time five of the children were adults, and three were still minors, the youngest being about thirteen years of age.

On the 4th of February, 1886, shortly before the expiration of the period of renewal or extension, Mr. Gaither, the assignee of the mortgage, filed a petition in the cause. In this the petitioner refers to the order of Court of the 29th of January, 1880, authorizing the receivers to mortgage a part of the land to redeem the whole from a tax sale, their execution of the mortgage to Templeman, and his assignment of it to the petitioner, the latter's agreement to extend or renew the same, which extension and renewal he avers was authorized and ratified by the Court by its order of the 6th of March, 1883, and exhibits the mortgage as part of his petition. He then avers that he holds the original note for the principal of the mortgage debt, and one renewal interest note which will fall due on

the 18th of March, 1886, that by the covenants in the mortgage the receivers agreed to pay taxes and keep the improvements insured, that the taxes for the years 1884 and 1885 are unpaid and that the insurance policy has expired, and is no longer in force. He further avers that by these breaches of covenant the whole mortgage debt has, by the terms of the mortgage, now become due and demandable, that the surviving receiver (the other having died in March, 1884,) had been discharged from any further management of the trust estate, by an order passed in December, 1885, (which order does not appear in the record,) and he therefore prays the Court to pass an order directing a sale of the mortgaged property "or so much thereof as may be necessary for the payment of the said indebtedness now due from said receivers," upon such terms and in such manner as the Court may prescribe. The Court set this petition down for hearing, and directed a copy of the order to be served on the solicitor for the trustee and the surviving receiver.

The trustee and all the children (the three minors by their mother and guardian *ad litem*) then came in and filed an answer to this petition, in which they set up various defences and objections to the passage of an order such as the petition prays for. They admit the passage of the order of the 29th of January, 1880, but aver that it was obtained without due proceedings. They admit that the receivers claim to have borrowed $2600 from Templeman, but deny that they ever received from him any such amount, or that it was necessary to borrow that sum to redeem the property from the tax sale, but on the contrary they aver that the amount required for that purpose was only $2012 and that the remaining $588 was an improvident waste. They admit that the receivers executed a paper purporting to be a mortgage to Templeman, but deny that the title to the land was ever in them as receivers, or that they had or had conferred on them any power or

authority to mortgage said lands, and they aver that the dry legal title was in the trustee and he did not even sign the alleged mortgage. They further allege that an exhibit which they make part of their answer, is a true statement taken from the accounts of the receivers, of their transactions concerning this pretended loan, which they crave leave to surcharge and falsify, and that the amount therein alleged to have been paid to Templeman as for commissions and expenses, was, in fact, gross usury, extortion, and fraud, and was retained by him in fraud of these defendants, and without any previous authority of the Court. They also aver that the amount retained by the receivers as compensation for their services and expenses, was unconscionable and excessive, and a fraud upon these defendants, and that all orders in relation to this alleged mortgage and allowances were obtained without notice to any of the defendants, none of whom save one were represented by counsel. They admit that Templeman assigned this pretended mortgage to the petitioner, and that the latter agreed with the receivers to extend the payment thereof for the period of three years, but they deny that this extension or renewal in any manner altered its character or cured its defects, and they allege that to all intents and purposes it remained the same transaction, chargeable with the same infirmities and objections to which the original transaction was liable. They further allege that the receivers paid Templeman $65 for pretended services in connection with this renewal, and paid themselves $54, although in fact no services were rendered by either of them in that connection. They admit that this renewal was authorized and ratified by the order of the 6th of March, 1883, but they allege that this order was obtained by fraud, misrepresentation and concealment and without notice to any of the defendants or any one for them. They admit the breaches of covenant alleged in the petition, but charge that such breaches resulted from the

gross mismanagement and carelessness of the receivers; and they again deny the validity of the mortgage or that the petitioner has any right to a foreclosure thereof or to a sale of the land by reason of the negligence and misconduct of the receivers, set forth in the petition. They admit that by an order passed in December, 1885, the surviving receiver was discharged from any future management of the trust estate, and from liability for such of it as has already passed to and is now in possession of the present trustee, but they again deny all and all manner of right on the part of the petitioner to interfere herein, by virtue of any covenant contained in this pretended mortgage, or by reason of any acts of omission or commission on the part of the receivers or either of them. They admit the right of the petitioner to intervene in the cause as a creditor of the estate to the extent he may be able to show he is a *bona fide* creditor thereof, but they reserve all rights of impeachment for mistake, waste, fraud or usury, "and they hereby tender themselves ready to pay or procure to be paid, in such manner as the law and facts will permit, whatever upon strict proof and proper accounting, may be justly found to be due to said petitioner, as well as to all other persons claiming to be creditors of said estate."

No proof was taken in support of any of the averments of this answer, but the cause was argued and submitted on the petition, answer, and antecedent proceedings in the case; and the Court on the 11th of March, 1886, passed an order directing the defendants to "bring into this Court on or before the 15th day of May next, to be paid to the said Thomas H. Gaither, assignee of the mortgage, the sum of $2600 secured by said mortgage, with all legal interest due thereon to the date of said payment, otherwise a decree will be passed by the Court for the sale of said real estate mentioned in said mortgage, or so much thereof as will raise a sufficient sum to liquidate the amount then due upon the mortgage, and the expenses of said sale."

From this order all the defendants who answered the petition, entered an appeal, and the affidavit of one of them states that the appeal " is based upon what she and the other defendants believe to be good and sufficient grounds of defence, and that the same is interposed for the *bona fide* purpose of testing the validity of said mortgage and the liability. of the estate thereunder, and is not interposed for the purpose of delay."

The cause was argued before ALVEY, C. J., YELLOTT, MILLER, ROBINSON, and BRYAN, J.

*James H. Saville,* for the appellants.

*William Stanley,* and *George R. Gaither, Jr.,* for the appellee.

MILLER, J., after stating the case, delivered the opinion of the Court.

There is no difficulty as to the construction of the trust created by the will of Richard D. Burroughs, and the codicil thereto. It is plain that his son, the trustee named in the will, took no beneficial interest whatever either in the trust property itself or the income therefrom. He held the property in trust for, and was bound to apply all its income to, " the maintenance, education and advancement " of his children, and to do this until the youngest child attained the age of twenty-one years. Nor can there be any doubt as to its being a trust over which a Court of equity had jurisdiction. Such a Court could assume the entire control and management of the property whenever its interposition was invoked by proper proceedings on the part of either the trustee or the *cestuis que trust.* It could remove the trustee for misconduct and appoint another in his place, or fill the vacancy in case of his death. Such control was assumed in this case by

the order of the 19th of January, 1880, appointing receivers. All the parties in interest were then before the Court under the cross-bill and answers thereto, the minor children having their mother as their guardian *ad litem,* and it is conceded this order · was duly and regularly passed. From its terms it is apparent the receivers were not appointed for a temporary purpose merely, but were to continue to act so long, at least, as the then trustee should retain his position. It gave them full power to take possession of the estate, to manage it, and to receive and disburse its income, under the orders and direction of the Court, and they were directed to account for the same at least yearly or oftener if required.

Before the receivers took possession, the whole real estate consisting of a large farm of eight hundred and · thirty-nine acres, with a dwelling-house and other improvements thereon, and worth at least $15,000 or $18,000, had been sold by the tax collector for about $1700, ·for taxes in arrear. This sale took place on the 5th of April, 1879, and had been reported to and confirmed by the Court. The purchasers were parties who had no interest, legal or equitable, in the trust estate. By the tax laws the owner has the right to redeem within twelve months from the date of sale by paying to the purchaser the purchase money with interest thereon, at the rate of fifteen per cent. from that date. *Act of* 1874, *ch.* 483, *sec.* 55.

More than nine months of the time for redemption had expired when the receivers entered upon the discharge of their duties, and they found no funds on hand or available from the income wherewith to redeem the property from this tax sale. They thereupon reported these facts to the Court, and asked for authority to sell or mortgage a part of the property in order to enable them to effect this re- · demption, which the Court granted by its order of the 29th of January, 1880. Acting under this express authority the receivers negotiated the loan and executed the mort-

gage over which the present controversy arises, and we shall now consider the objections that have been made to it.

1st. Its validity is assailed, and to this point most of the argument at bar was addressed.   The appellants contend that as the will conferred upon the trustee no power to sell or mortgage the trust property or any part of it, but simply gave him the power to receive the income and apply it for the benefit of his children, neither he nor the receivers, who were merely his temporary successors in the management of the estate, and the receipt and disbursement of its income, had any authority to execute this mortgage, and no such authority could be lawfully conferred upon them by the Court.   It is doubtless true, as a general proposition, that where the powers and duties of a trustee are limited and defined by the terms of the instrument creating the trust, neither he, nor the Court under whose administration the trust is carried on, can exercise any others.   It is also true that this will devoted the whole income to the children, and made no provision as to the payment of taxes.   But it must be remembered that the testator had no power to exempt his property from taxation, and that taxes are by law made a lien upon land, and that this lien which may be enforced by a sale, overrides every incumbrance which the owner may place upon it, and is independent of any disposition he may make of it by will or otherwise.   It was therefore part of the duty of the trustee to pay the taxes out of the income, even in the absence of any provision on the subject.   In fact the terms "rents, issues and profits," as used in this will, must be understood to mean such income as arises after taxes, as well as the necessary expenses of cultivating the farm and managing the trust, have been paid. When the Court therefore, upon assuming control of the trust, found that all this large real estate had been sold for taxes, for a sum merely nominal in comparison with

its value, and that the title to it was about to pass to strangers, the effect of which would be to break up the trust, it became its duty to act at once for the benefit of the *cestuis que trust*, most of whom were then minors, and take advantage of the privilege of redemption secured by the tax laws.   Under such circumstances, and where there was no other means of raising the necessary funds, we are of opinion the Court had the power to sell or mortgage a part in order to rescue the whole or as much of it as possible from this impending *vis major*.   It was a power derived from the necessity of the case, and one which every prudent owner would use if he found his property in such a dangerous position.   These *cestuis que trust* were the equitable owners of the property, and a Court of equity was managing it in their interest and for their benefit, and in such an emergency, and for such a purpose, we think the Court was clothed with all the powers of absolute ownership.   The Court thus having the power could unquestionably exercise it as well through the agency of the receivers as of the trustee.   Authority was expressly given and the receivers borrowed the money by means of this mortgage, and applied it just in time to prevent the tax title from becoming absolute and indefeasible.   No objection has been urged to the order appointing the receivers, but looking to the character of this trust, and the averments of the cross-bill, and the admissions in the answer of the trustee, we think the Court should have removed him, and appointed a practical farmer or man of business in his place, instead of retaining him and appointing two lawyers as receivers, to do the work of managing this farm for an indefinite period.   Such appointment seems to us to have imposed an unnecessary burden upon the estate.   But had this order been brought up on appeal and reversed, this Court would not have allowed the reversal to affect this mortgage, or any rights of the mortgagee thereunder.   So far, therefore, as its validity

depends upon the power of the Court, and the fact that the Court authorized it to be executed by the receivers instead of the trustee, we have no difficulty in sustaining it.

2nd. It is further insisted that this mortgage is invalid because the order which authorized it, was irregularly and unnecessarily passed. The grounds upon which this objection rests, are stated in a motion to vacate the order made by one of the children after the mortgage had been executed and the money applied by the receivers, and they are, 1st, that it was obtained without any notice to the parties interested, and 2nd, that it was unnecessary for the reason that the parties who bid in the property at the tax sale, would have willingly quit-claimed and conveyed all interest they might thereby have acquired for the benefit of the children interested. In our opinion neither of these objections, even if we should assume that such objections or any irregularity in the passage of the order, could affect the validity of the mortgage, can be sustained. It is true the order was passed on the same day the report of the receivers showing the perilous condition of the estate, and applying for the necessary authority to save it, was made. It is also true that it was passed without any preliminary order, setting the application down for hearing, and requiring notice to be given to the *cestuis que trust*, or otherwise bringing them in to show cause against the application. In ordinary cases such preliminary order would be proper if not essential. But here the facts that the tax sale had taken place on the 5th of April, 1879, and that it had been reported to and ratified by the Court, were well known to the parties interested, and were not only undisputed but had been charged in the cross-bill and admitted in the answers thereto. On the 29th of January, 1880, when the application was made, less than three months of the period of redemption remained, and according to the usual chancery practice such a prelimi-

nary order with service of notice, would have taken a large
part of this time, and the interposition of any objection,
even the most frivolous, would have necessitated a hear-
ing, while one which would have required the taking of
testimony would have postponed the passage of the order
still longer. Time was pressing, and was therefore an
important element to be considered by the Court. It was
essential, the receivers should have ample opportunity to
negotiate the loan, and in point of fact they succeeded in
obtaining the money only seventeen days before the period
of redemption expired. If the course now insisted upon
by the appellants had been pursued, it would, in all pro-
bability, have resulted in a defeat of the important object
sought to be accomplished. We are clearly of opinion
that under the circumstances no preliminary order was
necessary, nor would it have been either advisable or safe.
The Court was bound to act promptly in order to save the
trust and the trust property, and we approve its action in
this respect. As to the other objection, we find that it
does not state how the purchasers became the trustees of
Mrs. Burroughs, or how they or she could have been com-
pelled to convey their interests to the children. It is true
that she was their mother, but she took no interest under
the will, and was a stranger to the trust. But suppose
these parties were not only willing but had actually made
this transfer; what would have been the result? Un-
questionably the breaking up of the trust for the children
would thereby have become at once the absolute owners
of the property by a paramount title. It was the duty
of the Court, however, to preserve the trust as the testator
had created it. By providing for its continuance until the
youngest child attained majority, he manifested his inten-
tion that all of them should receive the same benefit from
the income. It may be that it would have been for the
interest of the adult children who had received their edu-
cation out of the income, to have the trust broken up, so

that they could come at once into full possession of their
share of the estate, but clearly such was not the inte-
rest of the minor children, and those of tender years,
whose education had not yet been begun or completed.
But at all events the duty of the Court to see that the
trust was preserved, was plain and imperative, and we
approve its refusal to heed this objection, if it was ever
considered.

3rd. But it is said the mortgage is tainted with usury.
No usury is apparent on its face, and all the interest notes,
both original and renewal, are at the legal rate of six per
cent.    The report of the receivers however states that
they negotiated the loan at seven per cent.    The extra
one per cent. amounting to $78, was retained by Temple-
man as *premium*, and is the first item in the statement of
the sums aggregating $176.90, which accompanied the
receivers' report of the transaction.    This was unquestion-
ably usury and in an ordinary case between individuals
would, if properly relied on, and at the proper stage of
the foreclosure proceedings, be eliminated from the mort-
gage debt.    A commission of two and a half per cent. on
the $2600, amounting to $65, was also retained by Tem-
pleman, and a like sum was paid to him as agent of
Gaither, when the mortgage was renewed.    It is manifest
that he was acting throughout the whole transaction sim-
ply as the agent of Gaither, and that it was the latter's
money that was originally loaned.    He assigned the mort-
gage to Gaither only five days after it was executed and
before it was recorded, and it was obviously given in his
name merely for convenience, whether such commissions
paid by a borrower to a real estate agent or broker who
negotiates the loan from the real mortgagee or whether
any of the other items in the statement submitted to the
Court by the receivers with their report, are to be re-
garded as amounting to usury, or whether they all pro-
perly come within the terms " expenses attending the

negotiation of the said mortgage," in the original order, or the terms "commissions and expenses of negotiating the said mortgage" in the renewal order, are questions which, in the view we have taken of the case, need not be now decided.

The question before us is can these appellants rely upon usury in this case ? The Court acting in their behalf was the mortgagor in the same sense in which it is the vendor of property sold by a trustee under its decree. This contract of loan was made by the Court through its officers on the one side and the lender on the other. The latter had the right to rely upon the presumption that the receivers would perform their duty and report the transactions to the Court, and if the Court disapproved the terms of the bargain, that his money would at once be returned to him. This report was promptly made by the receivers, and all the facts fully disclosed. Nothing whatever was concealed, and the Court approved their action. This approval was not by any direct order to that effect, but is clearly to be inferred from all the subsequent orders in the case which were passed after the terms of the contract had been repeatedly called to the attention of the Court, and we find nothing in the record to induce us to decide that such approval should, under the circumstances, have been withheld. There is no proof that the money could have been obtained on better terms, or that either the receivers or the mortgagee acted otherwise than in good faith. He said to the receivers, in effect, the Court can have my money for the purpose of redeeming this land from a tax sale, but can have it only on these terms, and if they are not satisfactory the money must be returned. If then the Court acting in behalf of these *cestuis que trust* thought it would be for their benefit to accept the terms and did so, we think it very clear that they cannot now interpose the objection as against the mortgagee that he has exacted usury from them. The

Court was abundantly able to protect their interests and such was its duty. The case therefore is not one in which a needy borrower has submitted to the exactions of an unscrupulous usurer.

4th. Some minor objections remain to be noticed. It is said the receivers exceeded their authority by borrowing more than was necessary, and that the mortgagee is chargeable with notice of this, because of the reference in the mortgage to the order under which they acted. The mortgage simply recites that an order had been passed in this cause, dated the 29th of January, 1880, authorizing the receivers "to mortgage a part of the lands described in said cause for the purpose of raising money to redeem the said lands from a tax sale." We do not think this reference made it the duty of the mortgagee to examine the original order, and read over all the proceedings in the case for the purpose of ascertaining when and for how much the land was sold, and then to go to the tax collector in order to find out how much it would take to redeem it, or that it made him chargeable with notice of what such an investigation would have disclosed, or imposed on him the obligation to determine whether $2423.10, would be more than the receivers needed to accomplish the purpose of the order. There is no proof that the receivers ever told him of the exact sum they would have to pay the tax collector, and in our opinion he had the right to rely upon their judgment as to the sum they required. There is no force in the further objection that what has been called the second or renewal order, authorized a "new mortgage," and did not in terms authorize a renewal or extension of time for the payment of the old one. Such renewal however was a substantial compliance with the order, and was certainly much less expensive to the estate than the negotiation of a new loan, and the execution of a new mortgage, would have been, while it accomplished the same purpose. Besides, if the old mortgage had not been renewed it would still remain

in force. It is scarcely necessary to say that the complaints in the answer that the receivers paid the taxes for the year 1879, out of the proceeds of the loan, and that they retained or were allowed too much for their services, can in no wise effect the mortgagee. He was not bound to see to the application of the money.

It follows from what has been said that the mortgage is valid and can be enforced. We have thus disposed of these questions because they have been fully argued by counsel on both sides, and in order to save the parties from the expense and delay of another appeal, but we are of opinion that the motion to dismiss this appeal must prevail.

The order appealed from is not a decree for a sale of the mortgage property. It does not decree a sale unless the money is paid by a given day. Nor is it an absolute order for the payment of money, nor yet an order determining a question of right between the parties, and directing an account to be stated on the principles of such determination. Appeals in such cases are allowed by sec. 21, Art. 5, of the Code. This order commands the defendants or some of them to bring the money due on the mortgage, into Court on or before a given day, "*otherwise* a decree *will be passed*" for a sale of the mortgaged premises. This amounts to nothing more than a *threat* to pass a decree for a sale *thereafter* if the money is not paid by the given day. It leaves the Court perfectly free to abandon the threat, or change its mind or intentions at any time thereafter. There is no provision of any statute which allows an appeal from such an order, and this appeal must therefore be dismissed. In thus deciding the questions argued, and at the same time dismissing the appeal, we have followed the course adopted by our predecessors in the similar case of *Phillips vs. Pearson*, 27 *Md.*, 242.

*Appeal dismissed.*

(Decided 10th December, 1886.)