FREEMAN *et al. v.* PRENDERGAST.

94  369|
98  745|
94  369
102  105
94  369
117  862
94  369
121  680
d121 631

1. Where, in the year 1847, before the adoption of the code, the su-
perior court of the appropriate county entertained the petition of
trustees praying that they be discharged from their trusteeship
and that another be substituted in their place, and where the
court in acting upon the petition undertook to guard and protect
the interest of remaindermen, all of whom were minors at the
time, and for that purpose exacted bond and security of the newly
appointed trustee, and where the creator of the trust, who was
the father of the remaindermen, expressly assented in writing to
the discharge and to the appointment of the particular person
who was selected to fill the vacancy, the infant remaindermen
were not indispensable parties to the proceeding, but it was dis-
cretionary with the court to require them to be made parties or
not, and to proceed with or without having them notified and
with or without an express order appointing a guardian *ad litem* to
represent them.   And the court, in the exercise of its discretion,
having granted the prayer of the petition and appointed a new
trustee, and he having given the bond and security required, the
judgment or decree, even if irregular, was not void, and when at-
tacked collaterally more than forty years afterwards, will not be

disregarded or treated as a nullity but will be upheld as good and valid so far as necessary to protect third persons in rights of property fairly acquired under it or in consequence of authority which it was intended to confer upon the court's appointee. Under all the circumstances, the father of the minors should be treated as their guardian *ad litem* recognized by the court, though not formally appointed as such. As to the substance of the matter, he was their guardian *ad litem.*

2. The power of sale conferred by the trust deed upon the original trustees passed to and could be legally exercised by the new trustee appointed by the court, the order of appointment expressly providing that he was to be clothed with all the powers which they possessed. The power of sale, being not merely unilateral but matter of express covenant in the deed between the parties thereto, was not one involving personal trust or confidence, but was a power pertaining to the trusteeship or the office and character of trustee, and was moreover a power coupled with an interest, the trustees as such being clothed with the legal title and estate in the trust property, which estate was the entire fee, inasmuch as the beneficiaries consisted of a married woman as tenant for life and of minor children in remainder, and the holding in trust being expressly declared by the deed to be for the remaindermen as well as for the life tenant, and some of the objects of the trust clearly indicating that they were to be executed irrespective of whether she were alive or dead.

3. No extinction of the power of sale resulted from the payment, prior to the exercise of the power, of all the debts of the creator of the trust, the power being broad enough to comprehend all the trust property and to embrace a sale for reinvestment as well as a sale to pay debts.

4. On the facts in evidence there was no error in directing a verdict for the defendant.

June 18, 1894. Argued at the last term.

Complaint for land. Before Judge FALLIGANT. Chatham superior court. June term, 1893.

ANDERSON & ANDERSON, PRESTON, GILES & POLHILL, R. R. RICHARDS and NORWOOD & CRONK, for plaintiffs.

GARRARD, MELDRIM & NEWMAN and DENMARK & ADAMS, for defendant.

LUMPKIN, Justice.

Under a decree of the superior court of Chatham county, George D. Millen became entitled to certain real and personal property as his distributive share in

the estate of John Millen. The realty included land in that county, and in the county of Jasper. On the 14th day of June, 1845, George D. Millen executed and delivered to Cornelia M. Millen and Jacob Waldburg, as trustees, a deed which, after reciting the conveyance to Jacob Waldburg, upon certain trusts, of a tract of land in the county last mentioned, proceeded as follows:

" And whereas the said George D. is now desirous of conveying the rest and residue of his distributive share of the real and personal estate of the said John Millen to said parties of the second part (Cornelia M. Millen and Jacob Waldburg), upon the uses and trusts hereinafter mentioned: Now, this indenture witnesseth that the said George D., for and in consideration of the natural love and affection which he hath and beareth unto his wife and children, and in further consideration of the sum of one dollar to him in hand paid by the said Cornelia M. and Jacob, and for other good and valuable consideration him hereunto moving, hath bargained, sold and delivered unto the said Cornelia M. and Jacob, and to the survivor of them, and to the executors or administrators of such survivor, all the estate, property real and personal, claims, demands, *choses in action* and ready money, which he, the said George D., is entitled to as distributee of the estate of the late John Millen, as aforesaid, except the land in Jasper county, above mentioned as conveyed to Jacob Waldburg upon certain trusts. To have and to hold the same unto the said Cornelia M. and Jacob, and the survivor of them, and the executors and administrators of such survivor, in trust, nevertheless, to pay out of the proceeds derived from the sale of the said property herein conveyed, or any part thereof, in the first place, any debts lawfully and justly due or owing by the said George D. to any person or persons, without any preferences, except such as are or may be given by the laws of Georgia; and after such debts have been paid or compromised, so as to leave no legal or just claim which now exists against him, then, in further trust, to hold the rest and residue of said estate, real and personal, for the sole use, benefit and behoof of Mary S., the wife of the said George D.,

for and during the term of her natural life, and not subject to the future debts, contracts or engagements of the said George D., or of any future husband with whom she may intermarry; and from and after the death of the said Mary S., then, in further trust, to and for the children of the said George D., to them, their heirs, executors, administrators and assigns forever, as tenants in common and not as joint tenants; but if any or either of said children shall die unmarried, or under legal age, then the share of him or her shall go to the survivors, and so on to the last survivor, and to and for no other use, intent or purpose whatsoever. And for the purpose of carrying this instrument more fully into effect, he, the said George D., doth hereby appoint the said Cornelia M. and the said Jacob, and the survivor of them, and the executors and administrators of such survivor, his attorneys or attorney irrevocable, to ask, demand, receive and sue for any and all of the estate and premises hereby conveyed, and to defend, either in their own names or in the name of the said George D., any suits that may be brought against them or him, having any relation to the matters herein contained; and it is also hereby covenanted and agreed by and between the parties to these presents, that the said Cornelia M. and Jacob, and the survivor of them, and the executors and administrators of such survivor, shall have power to sell and dispose of any or all of the premises herein mentioned, to such purchaser and purchasers, and upon such terms, as may to them, or the survivor of them, or the executors or administrators of such survivor, seem advisable, reinvesting, however, so much of the proceeds derived therefrom as may not be necessary to pay off the debts of the said George D., upon the same uses and trusts as are hereinbefore mentioned."

In April, 1847, Cornelia M. Millen and Jacob Waldburg filed in the superior court of Jasper county a petition which, after reciting, among other things, the making of the above mentioned deed of June 14th, 1845, alleged that after the payment of the debts of the said George D. Millen there were left in their hands, as trustees, a certain described lot of land in Chatham

county, containing ten acres, more or less, and a balance of one hundred and seven dollars and fifty-six cents in ready money. The petition further alleged that the petitioners resided in the city of Savannah, "far removed from the *cestuis que trust*," and, because of "the great inconvenience and trouble necessarily incurred in the management and direction of said estate," prayed that they "be discharged from said trusteeship, and some other fit and proper person be substituted in their place."

Accompanying this petition were the following papers:

"We . . do hereby express to his honor, Judge MERIWETHER, our entire willingness to the discharge of Jacob Waldburg and C. M. Millen, as trustees for said Mary S. Millen and her children, made by said G. D. Millen, conveying the portion of the estate of Col. John Millen, late of Savannah, which accrued to said G. D. Millen, and for the appointment by the court of Grief Linch as trustee to carry out and execute said trust. 23 April, 1847. (Signed)　　G. D. Millen,
　　　　　　　　　　　　　　　Mary S. Millen."

"At the request of George D. Millen and his wife, Mary S. Millen, I have consented to be appointed trustee for said Mary S. and their children in room of J. Waldburg and C. M. Millen, the present trustees.
　　　　　　　　(Signed)　　Grief Linch."
"Witness: John W. Burney."

An order was passed and entered upon the minutes of Jasper superior court, the material portion of which is as follows:

"Upon the application of Cornelia M. Millen and Jacob Waldburg, trustees of Mary S. Millen, the wife of George D. Millen, and the children by said marriage, asking for a discharge from said trusteeship and the appointment of Grief Linch as trustee; . . it is ordered that Grief Linch be appointed trustee, and be clothed with all the powers, and subject to all the responsibilities, of the original trustees, upon his giving bond, with good and sufficient security, in the sum of five thousand dollars . . . ; and that this order shall not dis-

charge Cornelia M. Millen and Jacob Waldburg, as trustees as aforesaid, from any liability whatever for any of their former acts and doings."

Grief Linch gave the bond required by this order, and undertook to discharge the duties of the trust. The children of George D. and Mary S. Millen were not made parties to the proceeding for a change of trustees, nor was a guardian *ad litem* appointed for them.

Afterwards, on the 6th day of April, 1849, Grief Linch, as trustee, under and by virtue of the appointment made as above stated, sold and conveyed to Michael Prendergast, of Chatham county, under whom the defendant in the present case holds, certain land embraced in the property conveyed by George D. Millen under the deed of June 14th, 1845, and which includes the land now in controversy. This deed from Grief Linch recited the deed of 1845, the resignation of the trustees therein named, his appointment and qualification as trustee in their stead, and purports to have been executed by virtue of the power conferred by the original trust deed, with which he, under the order appointing him trustee, had become clothed.

The plaintiffs in the present action, being the children and a grandchild of George D. and Mary S. Millen, claim title under the deed of June 14th, 1845, as remaindermen after the death of Mary S. Millen, the life tenant, who died September 5th, 1884. Among other things the plaintiffs contended: (1) that the appointment of Grief Linch as trustee was entirely void; (2) that even if his appointment was valid, the powers conferred upon his predecessors in the trust did not pass to him, and that therefore the deed made by him, April 6th, 1849, was without authority and passed no title to Michael Prendergast; and (3) that the power of sale conferred in the original trust deed upon Cornelia M. Millen and Jacob Waldburg had been exhausted by

them before any change of trustees was made, because, as the plaintiffs insisted, this power was given to the trustees only for the purpose of raising money to pay off the grantor's debts, and their petition to be relieved of the trust itself recited that they had paid off all the indebtedness of George D. Millen.

The record of this case is exceedingly voluminous. Many intricate legal questions were raised by counsel for the plaintiffs in error, upon which able arguments on both sides were made, and elaborate briefs were also filed; but under the view of the case taken by this court, it is unnecessary to consider all the points made in the record. We shall confine ourselves to a discussion of those questions only which are decisive of the case upon its merits, and the foregoing preliminary statement sets forth all the facts essential to this purpose.

1. The first of these is, whether or not the appointment of Grief Linch as trustee, in lieu of the original trustees named in the deed, was valid, the contention being that it was not, because the minor remaindermen, who were beneficiaries of the trust, were not made parties to the proceeding for the appointment of the new trustee. It must, at the outset of this discussion, be borne in mind that the appointment in question was made in the year 1847, which was long before the adoption of the code, and that the provisions of sections 4223 and 4224,—prescribing that in all cases of applications for the removal of trustees, all persons interested must have notice, and if minors having no guardian are interested, that guardians *ad litem* for them must be appointed and notified before the case proceeds,—were not then in force. The petition for the removal of Cornelia M. Millen and Jacob Waldburg and the appointment of Grief Linch in their stead was, of course, an equitable proceeding; and the question as to who are necessary parties to proceedings in equity is often a very

difficult and uncertain one. Probably the greatest un-
certainty exists as to when *cestuis que trust* should be
made parties. In Calvert on Parties to Suits in Equity,
\*212, reference is made to the oft-quoted assertion of
Lord Eldon, that in *most* cases respecting trust property,
the *cestuis que trust* should be made parties, following
which is the statement that : "This expression naturally
suggests an inquiry in what cases they are *not* to be
made parties." Referring to cases in which it was held
that they were necessary parties, the author continues :
" In the cases just quoted, the existence or enjoyment of
the property is affected by the prayer of the suit. But
there are cases in which the existence of the property
is not affected, and the only object is to transfer it into
the hands of the trustees. These two classes of cases
must not be confounded together. In cases of the for-
mer class, the interest of the *cestui que trust* is immediately
affected by the proceedings; not so in cases of the latter
class, for they will not lose their lien upon the property,
whether the trustee does or does not reduce it into pos-
session," and the conclusion seems to be that in cases
falling within the second class the *cestui que trust* need not
be a party. The classification above stated is perhaps
as nearly accurate as any which could be made; and we
will undertake to show that the rule deduced, so far at
least as relates to cases involving only the appointment
of new trustees, is well supported. Before referring to
authorities, it is, perhaps, well to observe that many of
the cases cited by counsel, and many not cited but which
have been examined, are cases having a twofold pur-
pose : first, the appointment of a new trustee; and sec-
ond, an accounting for and settlement of the trust estate
by the retiring or discharged trustee, thereby releasing
him from further liability for the trust property. This
latter purpose necessarily involves the trust property
itself, brings the interests of the trustee in direct con-

flict with those of the *cestui que trust*, and puts the case
clearly within the first class referred to by Calvert, in
which the *cestui que trust* is an indispensable party. Such
cases are manifestly no authority for holding that the
*cestui que trust* must be made a party where the sole
prayer is for the appointment of a new trustee; or,
whatever may be the prayer, where the sole relief granted
is such an appointment. And although it may be the
more common practice to include in the bill or petition
a prayer for a settlement of the trust estate as between
the retiring trustee and the one to be appointed, yet it
is not indispensably necessary that the proceedings
should have this twofold purpose. We see no reason
why a trustee may not be discharged and a new one ap-
pointed without the proceedings for that purpose ex-
tending, or being intended to extend, any further than
the mere substitution of trustees without involving any
settlement of the trust accounts or any release of the
old trustee from his liability to account for the trust
property which came into his possession. The case in
hand is exactly one of this kind, for it must not be over-
looked that the order appointing Grief Linch trustee
expressly declares "that this order shall not discharge
Cornelia M. Millen and Jacob Waldburg, as trustees as
aforesaid, from any liability whatever, if any, for their
former acts and doings." It is not essential to go into the
question whether or not the new trustee so far repre-
sented the minor beneficiaries as to bind them by any
settlement he might make with the old trustees *as to their
accounts.* If so, there is much strength in the position
that the minors should have been heard upon the ques-
tion as to who should be appointed. It may be that
under the above quoted terms of the order, these bene-
ficiaries still had the right personally to hold Cornelia
M. Millen and Jacob Waldburg accountable for the trust
funds in their hands, or for any waste or mismanage-

ment of the trust property which may have occurred before the change in trustees was made. Be these things as they may, it must not be forgotten that we are dealing with specific realty, the title to which could pass, and we think did pass, to the new trustee, upon the uses and trusts expressed in the original trust deed, and as to this particular property no "accounting" was at all necessary. It was precisely the same property, neither more nor less, and could be nothing else, no matter who was trustee. The beneficiaries, therefore, as to it, could not suffer by a mere change of trustees. Neither skill nor integrity, nor the want of either in the new trustee, could make any possible difference as to the interests of the beneficiaries in this real estate. Their equitable ownership in remainder of the identical property itself was exactly the same after the substitution of trustees as it was before; and accordingly, under the doctrine asserted by Calvert, they were not necessary parties to the proceedings by which the substitution was effected. After the appointment of the new trustee, they were protected by his bond, and of course he then became accountable to the *cestuis que trust* for all the trust property which came into his hands, and for the proper management and disposition of the same. Under the English practice, when there was a change of trustees, there was a formal conveyance from the old to the new trustee. It was therefore very properly said in Hill on Trustees, page 196, that: "The appointment of the new trustee by the court would not be complete without a conveyance or transfer of the trust property to him. The decree therefore usually goes on to direct a proper conveyance of the legal estate." Under our system, however, there is no formal conveyance from the old to the new trustee, but the title passes to the latter by virtue of his appointment.

We see no good reason why there may not be pro-

ceedings for the appointment of a new trustee which do not involve a final settlement with and release of the retiring trustee; and as, in such case, the only question to be passed upon is merely the substitution of trustees, we are satisfied that the *cestuis que trust* are not indispensable parties. There certainly seems to be no serious difficulty in reaching this conclusion in so far, at least, as the title to definite and specific realty may be affected by a substitution of one trustee for another. Keeping in mind the distinction between the two classes of cases mentioned by Calvert, some of the difficulties arising from the apparently conflicting decisions will be removed.

In the case of Ellison *v.* Cookson, 2 Coll. (Eng. Chanc.) 52, the object of the bill was to have new trustees appointed in the place of the heir-at-law of the survivor of two persons who were trustees for preserving contingent remainders. Antecedent to the estate of these trustees, and to the life-estate preceding it, was a limitation of a term of years to other trustees to raise portions. The vice-chancellor held that the trustees of the term should be made parties, but that the portionists (beneficiaries) were not indispensable parties. This case, however, is entitled to but little weight, for, as the estate of the portionists could not be affected by the change in the remainder trustees, and as the proceedings could not involve any conflict between the portionists and their trustees, the former might appropriately be represented by the latter. In Hunter *v.* Gibson, 16 Sim. 158, the report is very brief, but it appears that the master was directed to appoint a new trustee although some of the *cestuis que trust* were infants and another was out of the jurisdiction. The suit appears to have been only for the purpose of having a new trustee appointed. In Noble *v.* Meymott, 7 Eng. L. & E. Rep. 94, s. c. 20 L. J. (N. S.) Chanc. 612, which case, though

decided in 1851, was not under the English trustee act
of 1850, the facts were somewhat complicated, but the
ruling sufficiently appears from the following head-note:
"E. M. N. and his wife, under a power in their mar-
riage settlement, directed the trustees, after the decease
of the survivor of them, to receive a sum of 3000£ and
pay it to their three daughters equally. F. M. N., one
of the daughters, upon her marriage with S. D., assigned
all her interest in the appointed fund, by way of settle-
ment, to C. R. and T. L. Upon C. R. requiring to be
discharged from being a trustee, T. L., who had never
accepted the trusts, executed a deed of disclaimer, upon
which B. W. N. and J. N. were appointed trustees in
the place of C. R. and T. L., and C. R. assigned the trust
fund to them, but the trustees of the original settlement
alleged that T. L. had accepted the trusts and that B. W. N.
and J. N. were not trustees, and they refused to pay the
share of F. M. N. to them. Held, upon a bill filed by
B. W. N. and J. N., that they were duly appointed
trustees; and upon an objection for want of parties,
that the *cestuis que trust* and T. L. were not necessary
parties to the suit." In Milbank *v.* Crane, 25 How. Pr.
193, it is said that the jurisdiction in this class of cases
is "a *quasi* jurisdiction *in rem*, a power over the trust, and
is not acquired by the service of process upon the *cestuis
que trust*, or other person interested in the trust fund or
its preservation. It is undoubtedly proper and usual,
in most cases, to call those more immediately interested
before the court, that they may be heard in the appoint-
ment of a new trustee. But this is in the discretion of
the court." That the question as to who are the necessary
parties in such a case is one resting in the sound discretion
of the court, is also recognized in several other cases. *In
re* Robinson, 37 N. Y. 261, is a leading case on the subject.
In it the question as to parties was raised directly; and as
the views expressed coincide closely with those which

we have adopted, we cannot do better than quote the language of Bockes, J., delivering the opinion: "It is next urged that his (the trustee's) appointment was improper without notice to the infant *cestuis que trust*. This was not an application for the removal of a trustee and for the passing and settling of his accounts. Had it been such, all persons interested in the trust property and estate should have been notified and made parties to the proceeding, in the absence of all excuse for the omission. But in a proceeding simply for the appointment of a trustee to execute trust duties and powers, for the faithful performance of which security is always required, it is a matter of discretion with the court as to whom notice shall be given. The court in which the application is made may determine and direct in that regard, the appointment being always open to review on the application of any party interested and who may not have been informed of the proceeding. In applications of this character especially, the determination of the question as regards parties rests very much upon considerations of convenience. Indeed, Judge Story, in speaking of the subject of parties in actions and proceedings in equity generally, remarks that the rule 'does not seem to be founded on any positive and uniform principle; and therefore it does not admit of being expounded by the application of any universal theorem as a test.' He adds: 'It is a rule founded partly in artificial reasoning, partly in considerations of convenience, partly in the solicitude of courts of equity to suppress multifarious litigation, and partly in the dictates of natural justice, that the rights of persons ought not to be affected in any suit without giving them an opportunity to defend them.' In Harvey *v.* Harvey, 4 Beav. 215, it was said that it was a question of convenience whether the court would require all the parties interested in the subject-matter to be made parties.

And in Birdsong *v.* Birdsong, 2 Head's Term Rep. 289, it was held to be a question of discretion, rather than of absolute right. So it was held in Wiser *v.* Blachley, 1 Johns. Ch. 438, by Chancellor Kent, that the general rule that all persons whose interests may be affected by the decree must be made parties, was founded on convenience and subject to exceptions and modifications according to the discretion of the court.

In DePeyster, agt., *v.* Beekman *et al.*, 55 How. Pr. 90, it was held that the person creating the trust was not a necessary party to a proceeding to remove a trustee, and that the question as to who should be made parties to such a proceeding was within the discretion of the court. In Estate of Brick, 9 Civ. Proc. (N. Y.) 401, it was held that in a proceeding before the surrogate to remove a trustee and appoint another in his place, it was not necessary that all persons interested should be made parties, but that it was within the discretion of the court to say who should be made parties. Similar rulings were made in Tompkins *v.* Mozeman, 5 Redf. 405, and in Lane *v.* Lewis, 4 Dem. 468. In Barclay *v.* Goodloe's ex'r, 83 Ky. 493 (cited in note on page 85 of 27 Am. & Eng. Enc. of Law), it was held that beneficiaries are not necessary parties to a petition by a trustee for his discharge and the appointment of a new trustee. Here the trust deed conferred upon the trustee the power to name his own successor; but the case is nevertheless applicable, for it is well recognized that where such a power is not used, but resort is had to the court, the rules of law apply the same as if no such power had been conferred.

From the foregoing cases it will be seen that there are very high authorities supporting the proposition that the question as to who are necessary parties in a proceeding to appoint a new trustee in lieu of one who has resigned or been removed, is one resting in the sound dis-

cretion of the court. And the rule to this effect is as well supported by reason as it is by authority. One of the reasons upon which it rests we have already noticed before citing the authorities. Another reason arises out of the practice in such cases. Under the English chancery practice, it was customary to refer the appointment of a new trustee to the master, usually to approve of a new trustee to be appointed. And it seems that the chancellor would not appoint a new trustee without a reference to the master, except where all persons were represented and consented to the appointment. Hill on Trustees, 195, 196, and citations; O'Keefe *v.* Calthorpe, 1 Atk. 18. The question being referred to the master, it was his especial duty to hear evidence and investigate fully as to the suitableness and eligibility of the person proposed as the new trustee; and if no one was proposed, then to select a fit and suitable person to be appointed. The master, therefore, protected the interests of the *cestuis que trust,* and all others interested, so far as the selection of a fit and suitable person to be appointed as trustee was concerned; and inasmuch as the sole question involved in cases of this character related to the suitability of the person to be appointed (as we have already shown), it follows that every possible interest of the beneficiary was as fully protected and guarded by the master as it could possibly have been by a guardian *ad litem* especially appointed for that purpose. But under our practice, the duties of a master in chancery are more circumscribed, many matters devolving upon the chancellor himself, which, under the English practice, would be referred to the master. So far as we know, in Georgia the selection of a trustee has never been referred to a master. The chancellor hears evidence and selects a suitable person to be appointed trustee, just as he would act in selecting a person to be appointed receiver; and this being so, we see no reason

why the interests of the *cestuis que trust* would suffer at his hands more than under the English practice of referring the question to the master. Why might not a judge of the superior court, before there was an express provision of law to the contrary, appoint a trustee without having the minor *cestuis que trust* actually represented by a guardian *ad litem?* After carefully selecting and appointing a discreet and suitable person as trustee, and requiring ample security for the faithful performance of the duties of the trust, it may be safely assumed that, as this action was favorable towards, and could not reasonably be expected to injure, the interests of the *cestui que trust*, it was not of vital importance that he should be a party. It is always, however, within the discretion of the court to determine whether or not the *cestui que trust* should be formally made a party and a guardian *ad litem* appointed for him. As a guide to the exercise of that discretion in the present case, the court could assuredly take into consideration the facts: that it had before it both parents of the *cestuis que trust*, and knew their wishes; that one of these, the father, was the creator of the trust, and the other, the mother, was the life-tenant of the trust estate; and that there was nothing in the proceedings hostile to the minor *cestuis que trust*, who were remaindermen, or which had any tendency to bring their interests in conflict with those of the life-tenant. Under such circumstances it might well be expected that the father would be no less vigilant in guarding the interests of the minors than a guardian *ad litem* formally appointed would be. Virtually the father was their guardian *ad litem*, without the formal appointment. In Brandon *v.* Carter *et al.*, 24 S. W. Rep. 1035 (Mo.), it was held that the fact that minor beneficiaries were represented by attorney, and not by guardian *ad litem*, did not vitiate the appointment of a new trustee; and in *Ross, adm'r, et al.* v. *S. W. R. R. Co. et al.*,

.53 *Ga.* 514, a decree affecting the rights of minors for whom no guardian *ad litem* was appointed, but for whom an answer was filed by their mother who was their guardian by appointment under the laws of New York, was allowed to stand.    Although this decree was pronounced irregular and unwise, it was held to be not void if had in good faith, without fraud, and with intent to protect the minors.    The fact that the mother was guardian by appointment in another State, did not make her guardian here nor authorize her to represent the children as guardian in the courts of this State.    She was really no more than a *de facto* guardian *ad litem*—if such an expression may be used.    After citing authorities, Judge McCay says (page 528): "The failure to appoint a guardian *ad litem* in a regular chancery suit would seem, therefore, rather an irregularity than a defect, like want of service."    Again, on pages 530, 531, he says: " Their mother [meaning the mother of the minor defendants] appeared by acknowledgment of service, as their guardian, and by eminent counsel.    The only defect, so far as the parties are concerned, was that no formal order was passed appointing a guardian *ad litem*.    A guardian did appear, the court recognized that guardian, and throughout the whole proceeding the rights of the infants were taken care of."    In *Watkins et al.* v. *Lawton et al.*, 69 *Ga.* 672, it was held that where one, for himself and as next of kin for certain minors, filed a bill in equity, and there was a cross-bill to which the minor complainants were made respondents, they were, in the absence of fraud, bound by the decree rendered, though there was no formal order appointing the principal complainant in the main bill their guardian *ad litem*.

But if we are correct in holding that the court, in its discretion, could lawfully pass the order to change the trustees without making the minor *cestuis que trust* parties, it is unnecessary to further pursue the inquiry as

v 94-25

to the grounds upon which that discretion was exercised, or as to whether the discretion of the court was wisely exercised in this particular instance. Even if the court erroneously exercised its discretion, yet, as it had jurisdiction, its judgment or decree would not be void, and would therefore be upheld as against a collateral attack like that in the present case.

The presumptions which attach in favor of judgments and decrees rendered by courts of general jurisdiction apply even to formal orders passed by a chancellor at chambers. See *Pease* v. *Wagnon*, 93 *Ga.* 361, 20 S. E. Rep. 637. In Milbank v. Crane, *supra*, a case involving the legality of the appointment of a new trustee, but being a collateral attack on such appointment, it was said: "The appointment of the new trustee is valid, even if it should be thought to be irregular, or even imprudent and indiscreet, to make the appointment without formal notice to, and summons of, those interested." And in Dyer v. Leach, 91 Cal. 193, s. c. 25 Am. St. Rep. 172, a case involving the same question, it is said: "As the attack made here upon the order of the court appointing Hibbard trustee is collateral, it cannot be successful unless such order is absolutely void; but we do not think it void. The current of authorities is to the point that in such a case it is discretionary with the court what, if any, notice shall be given." To the same effect is the language of Smith, J., in Curtis v. Smith, 60 Barb. 12 : "It is also urged by the demurring parties that the appointment of the plaintiff as trustee was void for several reasons, among which are the following: that he was appointed on petition merely, and not by bill ; that the *cestui que trust* was not a party to the proceeding; and that the other persons contingently interested in the fund were not made parties. It is a sufficient answer to these several points to say that they are mere irregularities at the most, and do not touch the validity of the appointment."

We do not care to enter into a discussion of the numerous cases cited and relied upon by the counsel for the plaintiffs in error.    Many of them, by the application of the principles stated, can be distinguished from the case at bar; and such of them as cannot be, but which are in direct conflict with the conclusion we have reached, we feel constrained to say are not, in our opinion, supported by the weight of reason or authority.    We are very well satisfied that the court below correctly upheld the appointment of Grief Linch as trustee.

2. The next question of vital importance is, whether or not the powers conferred upon the trustees named in the deed made June 14th, 1845, passed to, and could be legally exercised by, Grief Linch as their successor in the trust.    In so far as the order of appointment could accomplish this purpose, it did so, for it expressly declared that Grief Linch, the new trustee, "be clothed with all the powers, and subject to all the responsibilities, of the original trustees, upon his giving bond, with good and sufficient security, in the sum of five thousand dollars."    We do not wish to be understood as asserting that the order appointing the new trustee could confer upon him a power of a sale, if none existed in the original instrument by which his predecessors were appointed.    Nor do we mean to say that where the original instrument did confer upon the trustees thereby appointed a power of sale, their successor could not exercise it unless the order appointing him expressly so declared. But, certainly if the power was one which could legally pass from the first trustees to their successor, it was appropriate to so provide in the order of appointment.    At any rate, the order appointing Grief Linch having undertaken to clothe him with all the powers possessed by Cornelia M. Millen and Jacob Waldburg, it is at least free from attack because of a failure so to do.

It seems to be a well settled and time honored prin-

ciple that where a will or deed confers upon trustees or executors a power involving a purely personal trust or confidence, and it is apparent that the testator or grantor expected and intended that the person appointed to carry out his direction should exercise a personal discretion in so doing, the power conferred will not pass to a successor appointed by the court. Thus, in Hibbard *v.* Lambe, Ambler's Rep. 309, it appeared that the testatrix, Esther Blunden, by will gave several legacies payable out of her estate, the residue to be disposed of in charity to such persons and in such manner as her executors, or the survivors of them, should think fit. Four executors were nominated; two of them died, another became very infirm; and thereupon, Lord Hardwicke referred to the master the appointment of additional trustees to sustain the annuities, but said the new trustees could not dispose of the residue in charity, it being a trust confined to the executors personally. Again, in 4 Viner's Abridgement, *485, we find reported a case involving the construction of the will of one Timothy Wilson, wherein the testator provided that, in a certain contingency, the executors were to dispose of his real and personal estate " to such of his relations of his mother's side who were most deserving, and in such manner as they saw fit, and for such charitable uses and purposes as they should also think most proper and convenient." One of the trustees declined to act, and was compelled by decree to assign the trust as the master should direct. The master of the rolls held that the power given by the will to the trustees, of distributing the testator's estate as they saw fit, was at an end and could not be assigned over; and accordingly, directed that one half of the estate should go to the testator's relations on the mother's side, and the other half to charitable uses. The doctrine of these ancient and respectable authorities has, so far as we are informed, been

followed down to the present day. We happen to have
before us just now a case in point on this question: that
of Drummond's adm'r *v.* Jones (N. J.), 13 Atl. Rep.
611; and others to the same effect, and in great numbers,
could easily be found. The question, however, is an
entirely different one when the power conferred is not
merely unilateral, but matter of express covenant in the
deed, and not one involving personal trust or confidence,
but properly pertaining to the office of trustee; and
especially is this so when it is a power coupled with an
interest. We think it becomes obvious, from an inspec-
tion of the deed of George D. Millen, that it was not
his intention to create in Cornelia M. Millen and Jacob
Waldburg a mere personal trust as to the sale of his
estate. The instrument, as will have been seen, ex-
pressly confers upon them, " and the survivor of them,
and the executors and administrators of such survivor,"
a power to sell " upon such terms as may to them, or
the survivor of them, or the executors or administrators
of such survivor, seem advisable." It is therefore mani-
fest that the maker of this deed did not contemplate
that the power should be exercised by the named trus-
tees and none others, or that it should cease to be oper-
ative in case of their death or resignation. Undoubt-
edly, under this deed, the power of sale would have
gone to the "executors" or "administrators" referred to,
for the deed expressly so declares. If the word "suc-
cessors " had also been used, there would be no room to
doubt that a successor duly appointed by the court would
have succeeded to the power of sale belonging to the
original trustees. As, however, the deed did not ex-
pressly extend the power of sale to the successors of the
trustees named; and as the sale upon the validity of
which this case turns was not made by Cornelia M. Mil-
len and Jacob Waldburg, or the survivor of them, or
by any executor or administrator of such survivor, but

by a trustee appointed by the court, the question is: Did the power of sale go to that trustee? If so, he acquired it under the order of court and by operation of law upon a proper construction of the deed, and not by the donor's express declaration. Under this deed, the trustees were clothed with the legal title and estate in the trust property, and the same was an estate in the entire fee, because the beneficiaries consisted of a married woman as tenant for life, and of minor children in remainder; and the deed plainly and distinctly declares that the holding in trust shall be for the remaindermen as well as for the life-tenant. Besides, some of the objects of the trust clearly indicate that they were to be executed irrespective of whether the tenant for life were alive or dead. For instance, the power to sell for the purpose of paying the debts of George D. Millen was evidently to be exercised even if Mrs. Mary S. Millen, the life-tenant, should die before the debts were all paid. Such being the character of the deed, we think the power of sale passed to the duly appointed successor of the original trustees. "A trustee who has been duly appointed under a power, and in whom the legal estate in the trust property has been vested by a proper conveyance or assignment, stands precisely in the same situation, and is invested with the same powers and privileges with reference to the trust estate, as if he had been originally appointed a trustee; with the exception, indeed, of discretionary powers personally given to the original trustees." Hill on Trustees, 188. To the same effect, see 2 Perry on Trusts, §503, where the following language is used: "But where the estate is transferred to trustees duly appointed under a power, the transferees take the estate and office together, and can exercise the power. But where the court appoints new trustees, it cannot communicate arbitrary or discretionary powers to them, unless the instrument of trust confers such

powers upon the trustees for the time being, or they are annexed to the office. If a power is given to a trustee, his heirs and assigns, and a new trustee is appointed, and a vesting order made, the new trustee may execute the power under the word ' assigns.' " In Johnson *et al.* v. Cushing, ex'r, 4 Shar. & Budd, Leading Cases, page 5, we find an elaborate discussion concerning the execution of powers by a surviving donee, or by substitute. On page 53, the following language occurs: "As to a power given to executors, the old rule was, that where a mere power was given to executors by name, then, if one died, the survivor or survivors could not execute the power; but if there were a devise to the executors to sell, then the survivor or survivors, having a power coupled with an interest, could execute the power. Co. Litt. 133a. This distinction is recognized in many modern authorities, and the conclusion may be drawn, that while a power coupled with an interest will survive the death of one of its donees, a naked power will not," citing: Franklin v. Osgood, 14 Johns. 553; Bartlett v. Sutherland, 24 Miss. 395; Peter v. Beverly, 10 Pet. 532; Lessee of Williams v. Veach, 17 Ohio, 171; *Parrott* v. *Edmondson*, 64 *Ga.* 332; Coleman v. McKinney, 3 J. J. Mar. 246; Ross v. Clore, 3 Dana, 189. It must not be understood that the "interest" referred to in the expression, "power coupled with an interest," means a personal beneficial interest on the part of the donee of the power. The phrase just quoted simply means that the donee is possessed of the legal estate, or of a right therein. See page 24 of the volume last above mentioned, and the cases there cited. In Drummond's adm'r v. Jones, *supra*, it was held that: " Where the power is annexed to the office of executor, and it is created to enable an executor to perform his duties there, although the words creating it indicate that the donee may exercise discretion, yet it will be held to belong to the office,

and may be exercised by any person who may happen. to fill the office." And see Farrar *v.* McCue, 89 N. Y. 142, in which it was held that a power of sale conferred by will upon executors passed to new trustees appointed by the court in their stead. The case which, upon its facts, is most nearly in point upon the question now un-- der consideration, is that of Druid Park Company *v.* Oettinger, 53 Md. 46. We commend to the careful con-- sideration of all interested the able opinion of Irving, J., and the authorities cited by him, which we think. abundantly sustain our conclusion in the present case, that the power of sale conferred by the deed of George D. Millen upon Cornelia M. Millen and Jacob Wald- burg passed to, and could be legally exercised by, Grief Linch, their successor in the trust under the court's ap- pointment.

3. There is one other question requiring brief notice at our hands. It will have been observed that in the petition presented to the court by Cornelia M. Millen and Jacob Waldburg to be relieved of the trust, it was recited that they had paid all the debts of George D. Millen; and it was, accordingly, insisted by counsel for the plaintiffs in error, that inasmuch as the trust deed declared that, out of the proceeds derived from the sale of the grantor's property, the trustees should pay all of his debts, and, after the payment of the same, "to hold the rest and residue of said estate, real and personal," upon the trusts already mentioned, the power of sale had become exhausted before any change of trustees was made. We think a complete answer to this contention will appear from an examination of the deed of trust. The power of sale was undoubtedly broad enough to comprehend all the property conveyed by the deed, and it is evident that the grantor did not intend to confine the exercise of this power to the one purpose of raising a sufficient sum of money to pay off his indebtedness.

He evidently believed the property in question was worth more than enough to settle all his debts, and the facts show that he was right in so believing. The language of the deed itself leaves no room to doubt that George D. Millen intended that the original trustees should have the power to sell, not only for the purpose of paying his debts, but also for reinvestment. This will become apparent from a mere glance at the words used in the deed at the conclusion of the clause investing the trustees with the power of sale. After expressly giving to them the power to sell and dispose of any or all of the property conveyed, the following words are used: "*reinvesting,* however, so much of the proceeds derived therefrom as may not be necessary to pay off the debts of the said George D. Millen, upon the same uses and trusts as are hereinbefore mentioned." The language just quoted, in connection with other portions of the deed, establishes beyond controversy, we think, the correctness of the proposition stated in the third head-note.

4. The charge of the court amounted, in substance, to a direction that the jury should find in favor of the defendant. The case was absolutely controlled by the legal principles which we have announced and endeavored to sustain in the foregoing divisions of this opinion. Our views of the law coincide entirely with those entertained by the eminent trial judge; and if these views are correct, the only verdict legally possible from the undisputed facts was that which the jury returned, and consequently, his honor committed no error in giving the direction above mentioned.    *Judgment affirmed.*