(October Term, 1938)

## STATE v. UNDERWOOD ET AL.

(Nos. 2082, 2083, 2084; January 24, 1939; 86 Pac. (2d) 707)

O

2

4

6

For the plaintiff in each case, there was a brief by *Ray E. Lee,* Attorney General; *T. F. Shea,* Deputy Attorney General; and *William C. Snow,* Assistant Attorney General of Cheyenne, and oral argument by *Mr. Shea.*

8

For the defendant and appellant, Harry Devine, Jr., there was a brief and oral arguments by *C. R. Ellery* and *A. G. McClintock* of Cheyenne.

For the defendant and appellant, J. C. Underwood,

there was a brief by *Hagens & Wehrli* of Casper and *C. O. Brown* of Douglas and oral arguments by *Messrs. Brown* and *Hagens.*

For the defendant, Town of Glenrock, there was a brief and oral argument by *C. O. Brown.*

For the defendant, County Treasurer of Converse County, there was a brief and oral argument by *T. C. Daniels* of Douglas.

BLUME, Justice.

This is an action for a declaratory judgment, arising under the will of John E. Higgins, who died on June 24, 1926, and whose will, evidently written by himself, a layman, is as follows:

"June 30, 1924

I hereby will and bequeath to the State of Wyoming all of my property both personal and real.

From the income I want the following relatives to be beneficiaries:

Frederick W. Higgins, Denver, Colorado, nephew, One thousand (1,000.00) dollars per year.

Ann Devine, Milwaukee, Wis., daughter of my deceased sister, Lizzie Higgins Devine, and her nephew, Harry Devine, Jr., Two thousand ($2,000.00) dollars per year. When Ann Devine dies, $1,000.00 of the above reverts to the estate, should Harry Devine die or lead a discreditable life the remaining thousand dollars shall revert to the estate.

To Vivian Higgins, Carol Higgins, and Lucille Higgins, children of my brother James, deceased, One thousand ($1,000.00) dollars per year each, and to Eloise Amoretti, daughter of Eugene and Ella Amoretti of Lander, Wyoming, One thousand ($1000.00) dollars per year.

The above and all other property real and personal to belong to the State.

It is my wish that the State create a trust whose life shall be not less than 50 years, for the administering of this property, at the end of the 50 years to distribute the property to the best interests of the State, or to hold it intact as the best judgment of the proper authorities of the State may dictate.

JOHN E. HIGGINS."

The probate of the will was contested. By Chapter 104, Session Laws of 1927, (amended in 1931), the Legislature created a Board of Wills and Trusts, composed of the Governor, the Attorney General, and the Superintendent of Public Instruction, authorizing the Board to compromise and settle contests in connection with grants or gifts to the State of Wyoming. Pursuant to this power, agreements were entered into in March and April, 1928, which resulted in the withdrawal of the contests above mentioned and the settlement by payment of lump sums in the satisfaction of all annuities mentioned in the foregoing will except that due Harry Devine, Jr. These agreements were approved by the court and the will was admitted to probate in May, 1928. The estate was thereafter duly administered and distributed. By the decree of distribution, made November 7, 1929, it was provided:

"That Harry Devine, Jr., one of the legatees named in the will of said testator, be and he is hereby awarded the sum of $1000 per year for the period of fifty years from the death of said testator, with the understanding, however, that said annuities shall cease upon the death of said legatee, and it is also hereby decreed that said annuity shall cease if the said legatee shall at any time during said period lead a discreditable life, which annuity shall be paid by the State of Wyoming to said legatee during said period of time, all in accordance with the testator's wishes as set forth in his last will."

The decree then provides that the whole of the testator's estate is "vested by full and absolute title in the State of Wyoming."

Thereafter, by Chapter 157, Session Laws of 1929, the legislature provided for the Higgins Memorial Foundation, giving to that foundation the property belonging to the estate of John E. Higgins, and to be administered by the Board of Trustees of the University of the State of Wyoming. Thereafter the State, on the relation of the Attorney General, W. O. Wilson,

brought an action against the Board of Trustees of the University to determine the status of the property acquired by the State under the foregoing will, and contesting the validity of the law providing for the Higgins Memorial Foundation. The law was declared unconstitutional by the trial court. The case was appealed to this court. Bond, et al ., v. State ex rel. Wilson, 45 Wyo. 133, 16 P. (2d) 53. On the appeal this court held that Chapter 157, supra, is unconstitutional, and that the property, so long as the annuities are payable to Harry Devine, Jr., is not part of the perpetual school fund of this state. This court stated in part as follows:

"We cannot agree that the property belongs to the common school fund, but hold that, until the annuity as a charge upon the property is satisfied, the State should administer the property, or its proceeds, and income as a trust fund to be appropriated and applied to the payment of the annuity. We do not think we need decide what state officers or agents have the present right or duty to manage and control the property for the State. The defendants' asserted right in that regard is, of course, denied. No one else questions the right of those now in control. We may assume that the legislature in view of this decision, will provide for the proper administration and application of the property as a trust fund either by state officers whose duties may be defined by law, or by some one who shall act under authority and direction of the proper court. In the absence of legislative action on the subject, it may be necessary for the executive officers in possession of the property to invoke the action of the courts for the purpose of executing the trust."

Pursuant to the order of this court, the district court entered a modified judgment in the foregoing case, on December 30, 1932, providing therein in part as follows:

"It is further ordered, adjudged and decreed that said property, real and personal, as belonging to and

constituting a part of the Estate of John E. Higgins, deceased, and the income therefrom, be and the same is hereby declared to be a trust fund subject to the payment of the Harry Devine Jr., annuity, and to be administered as such by the State of Wyoming under and by authority and direction of this Court; that said trust fund to be established, administered and maintained, first, for the purpose of paying, according to the terms of the will of said John E. Higgins, deceased, the annuity in the sum of One Thousand Dollars ($1,000.00) per year for a period during the natural life of Harry Devine Jr., and should he live so long not to exceed a period of fifty (50) years from the date of the death of said John E. Higgins, and to terminate at any time during the life of Harry Devine, Jr., if he shall lead a discreditable life.

"It is further ordered, adjudged and decreed that the assets of said estate, consisting of both real and personal property, for the purpose of dedicating the property of said estate to the payment of said annuity, shall be in the custody of this Court and shall be administered, handled, used and managed by some one designated to act under authority of this Court for said purpose; and that said property shall remain under such supervision, jurisdiction and management until said Harry Devine, Jr., shall have reached his majority, or so long as may be necessary to fully discharge the obligation to the said Harry Devine, Jr., according to the terms of said Will, and until a proper final disposition of the remainder of said estate has been determined by authoritative legislation for that purpose."

On January 7, 1933, the court, again reciting the foregoing action, and the order of this court, and the annuities due Harry Devine, Jr., appointed J. C. Underwood as Trustee "with authority to possess, control and manage all of the property of said estate and on specific orders of this court to be entered from time to time to liquidate said properties and convert the same into cash funds under the orders of and subject to the approval of this court." The trustee was required to give a bond, and he soon thereafter qualified

in accordance with the order of the court and has managed the property ever since that time. Prior to that appointment it seems that the property had been managed by the land commissioner of this state.

The instant action is, as before stated, an action for a declaratory judgment. The State of Wyoming is plaintiff, and it is brought by the Attorney General of this state. J. C. Underwood, Trustee, Harry Devine, Jr., and the County of Converse, and the Town of Glenrock are defendants in the action. The petition recites many of the statements heretofore made, mentions the property of the trust, consisting mostly of real property and partially of personal property, sets forth the fact that the expenses of administering the trust are large, that large sums of taxes are due, as well as installments on certificates of purchase of some land, and that, in order to preserve the estate it is necessary that the property of the estate should be sold and converted into securities which bring a definite income per annum; that it also may be necessary to mortgage some of the property of the estate for the purpose of preserving it; that the title of the property is disputed, making it uncertain as to who should sell and convey it; that it is accordingly necessary that the rights, powers, status, duties and other legal relations of the parties to this suit be determined, and the petition asks that the court determine the following:

1. Has the defendant, J. C. Underwood, Trustee of the John E. Higgins Estate Trust, power and authority, under the supervision and direction of the Court having jurisdiction of said Trust, or otherwise, to borrow money and to pledge the property of said estate by mortgage or otherwise as security therefor to provide funds necessary for the payment of taxes, legacy or other obligations of said estate when necessary for the preservation thereof?

2. Has the defendant, J. C. Underwood, Trustee of the John E. Higgins Estate Trust, power and authority,

under the supervision and direction of the Court having jurisdiction of said Trust, or otherwise, to sell and convey, passing good title thereto to the purchaser, of any part of the property belonging to said estate, for the purpose of raising funds for said estate to pay taxes, legacy and other expenses of said estate when necessary for the preservation thereof?

3. Is it the legal duty of said Trustee, under the provisions of said Will, to pay Harry Devine, Jr., the legacy of $1,000.00 per annum for the time specified in the Will out of the corpus and earnings of said estate, when the earnings of said estate remaining after payment of taxes and current expenses are insufficient therefor, or is said Trustee legally required to pay said legacy only out of the earnings after taxes lawfully assessed and all legal current expenses have been paid?

4. In case the Court holds that said Trustee may lawfully mortgage or pledge the property of said estate to secure a loan as aforesaid, is said legacy of $1,000.00 per annum payable to said Harry Devine, Jr., under the provisions of said Will, a prior charge against the corpus of said estate, and is it superior to the lien of said mortgage, or is such mortgage a prior and superior charge to said legacy, to be satisfied in preference thereto?

5. In case the Court holds that said Trustee may lawfully sell and convey the property of said estate, passing good title thereto to the purchaser, for the purpose of raising funds to pay necessary expenses for the preservation of said estate, is said legacy of $1,000.00 per annum, payable to the said Harry Devine, Jr., under the provisions of said Will, a prior charge against the corpus of said estate, or may the Trustee transfer and convey the property so sold free and discharged from the charge of said legacy?

6. Is the property of said Estate in the hands of said Trustee subject to State, County and Municipal taxes, and are the taxes heretofore levied against the same a lien upon said property, or is said property belonging to the State of Wyoming free from State, County and municipal taxes?

7. Does the defendant, J. C. Underwood, Trustee, as aforesaid, have the power and authority, under the supervision of the Court having jurisdiction of said

estate, to sell and convey any part or all of the property of said estate, for the purpose of investing the proceeds thereof in other property or securities?

8. That the court determine the proper distribution of costs in this case, and for all other proper equitable relief.

The defendants appeared in the case, each asserting what were conceived to be their respective rights. It was shown that at the time of the probate of the Higgins will, the value of the estate was approximately $597,000. At the time of its distribution, evidently after the compromise and settlement heretofore mentioned were made, the value was approximately $347,000. By September 22, 1937, the value had been reduced to approximately $122,000, the real estate being of the value of approximately $80,000. It further appears that much of the property of the estate does not produce income sufficient to pay expenses, while a great portion produces no income at all. The trial judge who entered the modified judgments in the case of Bond et al. v. Wilson, Attorney General, supra, testified that they were entered pursuant to the direction of this court, and his testimony in part further is:

"Q. Before making the order appointing the trustee which has been testified to, did you have any negotiations or conferences with any of the executive officers of the State in which they requested that you make this order?

A. Mr. Greenwood, the Attorney General, was looking after the matter at the time, and my recollection is that the delay in the entry of the two orders was that he took that time to consult with the state officers before he asked for the appointment of the trustee.

Q. Mr. Greenwood, the Attorney General, supervised the legal end of this as attorney?

A. All the way through, yes, as long as he was in office."

The trial court in the instant action made certain declarations and orders hereinafter mentioned, and

which will be discussed in detail hereafter. A few additional facts will also be mentioned in connection therewith. The plaintiff and Underwood and Harry Devine, Jr., have appealed. Their respective contentions, wherever necessary or advisable, will be stated hereafter. All three appeals have been consolidated in this court, so that but one opinion is necessary herein.

1. *Annuities Payable Out of Corpus.*

The trial court declared:

"That the annuity of said Harry Devine Jr. constitutes a charge against the corpus of said trust property payable whether the net income therefrom is sufficient or not, and if such net income is insufficient therefor, the trustee should sell so much of the property of said trust as is necessary to satisfy the same."

The decision that the annuity is a charge against the corpus of the trust property is challenged by the State as well as Underwood. It would seem that it is best to discuss and determine this point first, for more or less light will then be thrown on a number of other questions involved herein, including the question of title, the question of interest and the question of taxation. The will states that the annuity is payable out of the income. Counsel for Devine seek to sustain the court's declaration on the theory that the decree is inconsistent with the will, that it declares the annuity to be a charge on the corpus, and that it, accordingly, not having been appealed from, is binding on the parties. The rule appears to be that where the will and the decree are inconsistent, the decree will govern. 11 R. C. L. 184; 24 C. J. 532. And reading the original decree and the modified decree together, there may be ground for the contention of Devine. See In Re Miller's Estate (Minn.) 156 N. W. 349. On the other hand, the original decree has in it the statement that the annuity shall be paid "in accordance with the testator's wishes

as set forth in his last will." The modified decree contains the statement that the trust fund shall be administered "first for the purpose of paying, according to the terms of the will * * * the annuity in the sum of $1000" etc. And there are cases which hold that if the decree refers to the will, the latter must be considered and will govern. In Re Efferson's Estate, 70 Utah 258, 259 Pac. 919; In Re Ewer, 177 Cal. 660, 171 Pac. 583; Horton v. Winbigler, 175 Cal. 149, 158, 165 Pac. 423, 427; Fraser v. Carman-Ryles, (Cal. App.) 57 P. (2d) 979; Porter v. Wheeler, 131 Wash. 482, 230 Pac. 640; Fraser v. Carman-Ryles, 8 Cal. (2d) 143, 64 P. (2d) 397; In Re Lochart's Estate, 21 Cal. App. (2d) 574, 69 P. (2d) 1001. However, even if this view is taken, we must, we think, arrive at the same result, as we shall proceed to see.

The ultimate criterion as to whether or not an annuity may be charged against the corpus of the property is the intention of the testator. Smith v. Fellows Adm'r., 131 Mass. 29; First Huntington Nat. Bank v. Colvin, 114 W. Va. 193, 171 S. E. 413; note 6 A. L. R. 1359; note 73 A. L. R. 1252. And it has been said that among questions of testamentary construction, this may be ranked as one of the most difficult. Note L. R. A. 1917 E. 583. That is particularly true in the case at bar, where the will was drafted by the testator himself who was not a man of any legal training. Take, for instance, the sixth paragraph of the will. The testator had previously given the property to the state; he then provided for certain annuities, and thereafter in the sixth paragraph provides that "the above and all other property real and personal to belong to the state." What did he mean? He cannot have meant the statement literally, for he clearly did not mean to give the state the annuities for which he had provided. He either must have meant that he gave to the state the principal of the property from which the annuities

were derived or the residue of the property after the annuities were satisfied, and if the latter, the corpus should probably be held to be liable. 69 C. J. 1190; 3 C. J. 212; 3 C. J. S. 1382. So we cannot take the statements in the will literally, either in this or other respects. We are largely groping in the dark, and the best which we can do is to attempt to place ourselves as nearly as we may in the position of the testator and try to determine as nearly as possible his probable intention. Certainty is out of the question.

The will expresses the wish that the state should create a trust. Just what the testator meant by the state creating such trust is not clear. Possibly he had a legislative act in mind. We think, however, that this is immaterial. A testamentary trust may be created, if a reasonable construction of the language of the will as a whole and the surrounding circumstances show that to have been the intention. 69 C. J. 712. We think that such intention appears. In Re Ingram's Estate, 104 Cal. App. 1, 285 Pac. 365. That fact is not questioned by any of the counsel herein, and that is the view we took in Bond v. State, supra, where, speaking of the decree of distribution, we stated that "we find the expressed intention to create a relation between the State and Devine which need not be distinguished from a trust." Testator provided that the trust should last for fifty years or *more*. He later provided that the property should be distributed or held intact after the *fifty years*. This again shows that we cannot take what the testator provided literally, for he probably had something in mind when he added in the first of the above provisions the words "or more." He probably, as intimated in Bond v. State, supra, intended that the trust should last until the death of the last annuitant, so that we may probably read the will as though providing, like many other wills mentioned in the decided cases, a devise and bequest to trustees, upon trust, to

pay certain annuities, with the remainder belonging to the State. What the remainder should be is, as above mentioned, uncertain. The final decree in the Higgins estate limits the payment of the annuity to Harry Devine, Jr., to the period of fifty years. That limitation, though it may be controlling so far as the annuitant is concerned, does not, we think, stand in the way of what we have said in connection with the interpretation of the will on the question now before us. The bequest in this case is indirect, not direct; that is to say, the testator, instead of providing, e. g., that "I hereby bequeath to Harry Devine an annuity of $1000 to be paid out of the income," he provided for the annuity indirectly by stating that "from the income" etc., "I want Harry Devine to have an annuity of $1000." We do not think, in view of what has already been stated, that this should make any difference in this case, and we may, accordingly, treat the provision for the annuity as one directed to be paid out of the income. On its face, then, the annuity is payable only out of the latter. That, however, is not conclusive, if, on the whole, a contrary intention may be gathered from the terms of the will. Note L. R. A. 1917 E. 586; Smith v. Fellows, 131 Mass. 20; Pierpont v. Edwards, 25 N. Y. 128; Perkins v. Cooke, 2 Johns. & H. 393, 70 Eng. Repr. 1150, and other cases found in the note to L. R. A. 1917 E. 583 and subsequent pages. Certain subsidiary rules have been laid down by the courts in arriving at the intention of the testator. One of these has already been mentioned, namely, that, if the remainder over is made subject to the payment of legacies or annuities, the courts have generally construed the corpus of the property to be subject to the payment thereof in case of failure of income. If, on the other hand, it is clear that the corpus is to be held intact and shall go to specific persons or purposes, the annuitant will, ordinarily at least, be confined to the income.

Note L. R. A. 1917 E. 589. We might say in passing that no such purpose appears in the will before us.

It is stated in another subsidiary rule, held by some of the courts, that if the annuity is made "an unlimited and indefinite charge upon rents and profits, resort may be had to the corpus in case the income is insufficient." 3 C. J. 213; 3 C. J. S. 1382. We think that it would make no difference whether reference is made to "rents and profits" or to "income," and if so, the will before us would come within the rule—if adopted. By an "unlimited and indefinite" charge, courts apparently mean that the charge is not limited to the *annual* income or the income *during the life* of the annuitant. Illustrations may be given. In Gillespie v. Boisseau, 23 Ky. L. 1046, 64 S. W. 730, the testatrix provided for a trust and that "from the rents and profits," her surviving husband should have $20 per month to live on. It was held that the annuity was a charge upon the whole estate. In Phillips v. Gutteridge, 4 DeG. & J. 531, 46 Eng. Rep. 664, 3 Eng. Ruling Cases 197, the facts will appear from the opinion of the court, which, so far as pertinent here, is as follows:

"An unlimited indefinite charge upon rents and profits is a charge upon the corpus, just as an unlimited indefinite gift of rents and profits is a gift of the corpus. The trust in this case is in effect out of the rents and profits to pay the testator's daughter 60 pounds a year during her life, not out of the rents and profits during the life of the daughter to pay her the annuity. The right of the trustee to receive the rents and profits is general and indefinite; there is no limitation of time. The charge, therefore, upon the rents and profits is unlimited and continues until the annuity is satisfied."

The test here mentioned would seem to have negative rather than affirmative force. The provision mentioned fails to show affirmatively that it was the testator's intention that the corpus should be held, and the rule

would have no force whatever, if it appears from other provisions in the will that only the income was intended to be given. Note L. R. A. 1917 E. 588; Stelfox v. Sugden, 1 Johns. 234, 70 Eng. Rep. 410; Delaney v. Van Aulen, 84 N. Y. 16; Einbecker v. Einbecker, 162 Ill. 267, 44 N. E. 426. Some negative force may, however, be given to such provision, for the testator might have provided that the annuitant should be confined to the annual income from the property, or at least the income accruing during the life of the annuitant; thus eliminating any doubt on the subject. But with the provisions in the will as they are, doubt is left (unless other provisions not yet considered dissipate it), and the test above mentioned may well be connected with another rule, namely, that in case of doubt, a legacy will not be construed to be specific. An annuity comes within the term legacy in the broad sense of that term, and will generally be construed in the same way. 3 C. J. 212; 3 C. J. S. 1376; Pomeroy, Equity (4th Ed.) Sec. 1134. Legacies are of three kinds, specific, general, or demonstrative. Without attempting to be too precise, we may say that a specific legacy is a bequest of a specific article of the testator's estate, distinguished from all others of the same kind, as, for example, a particular horse, or piece of plate, or money in a certain purse or chest, etc. Pomeroy, supra, Sec. 1130. A general legacy is a gift of a certain amount of money without pointing out any source from which the amount is to be paid, for instance: "I bequeath to A. B. $500.00." Pomeroy, supra, Sec. 1132. A demonstrative legacy partakes of the nature of both a specific and a general legacy, and combines the advantages of each. It points out—demonstrates—the funds from which payment is to be made, but differs from a specific legacy in that if the fund pointed out for payment of the legacy fails, resort may be had to the general assets of the estate. Pomeroy, supra, Sec. 1133. In the

case at bar, for instance, the fund pointed out as at least the primary fund from which the legacies are to be paid, is the income of the property. Now it is a rule of construction, announced by the court many times, that in case of doubt a legacy will not be construed to be specific, but will be construed either to be general or demonstrative. Note 6 A. L. R. 1360; note 73 A. L. R. 1252; Shepard v. Bryan, 195 N. C. 822, 143 S. E. 835. It is stated in 69 C. J. 926 that "a legacy is presumed to be demonstrative rather than specific." While most of the cases announcing this rule deal with specific amounts of money as distinguished from annuities, the rule has been applied to the latter. Smith v. Fellows, 131 Mass. 20; Mann v. Copeland, 2 Madd. 223, 56 Eng. Rep. 317. Pomeroy, supra, Sec. 1134, states: "It (an annuity) is ordinarily, however, made payable out of some designated fund; as, for example, out of certain stock, or the interest arising from certain mortgages, or the rents and profits of certain land. Such an annuity is in all respects a demonstrative legacy and is governed by the rules regulating that species of legacies."

It is stated in note 6 A. L. R. 1361 that "the inclination against construing a legacy as specific is especially noted in those cases where a legatee is a natural object of the testator's bounty." Many cases are cited. Courts have frequently called attention to, and sometimes have laid stress on the fact that this or that beneficiary would be the natural object of such bounty. Cases 6 A. L. R. 1361-2; Corley v. Harper, 219 N. Y. 295, 114 N. E. 351. And that fact, in its broad aspect, should be, we think, the controlling factor herein. Who, or what, relatively, was the primary and main object of the testator's bounty? If he had known that the income would prove to be insufficient to provide the annuity, would he, nevertheless, have preferred that the state should have the corpus intact, rather than

that the annuitant should have the benefit of the provision in his favor? In this connection we must bear in mind that the testator did not require the corpus to be kept intact. He pointed out no specific purpose to which the fund was to be devoted by the state. The gift to it was general. That, we think, is significant, and would seem to indicate, in view of the comparatively large and varied expenditures of the State, that the testator did not consider it as the main object of his bounty, but chose it, perhaps, as the safest medium through which the annuities would remain secure. On the other hand, the annuitants were the testator's nearest relatives. As such they were the natural objects of his bounty. He evidently limited his bounty to annuities, so that they would have something during life. He made an attempt to make that sure when he provided for a trust on the part of the state to be administered, as already indicated, till the death of the last annuitant. We think that the ordinary man would have had the attitude here mentioned. There is nothing in the evidence which indicates that the testator should be measured by any other standard. We think, accordingly, that the annuities should be construed as demonstrative in character, just as we thought in Bond et al. v. State, supra. It is, perhaps, needless to say that our conclusion herein is not inconsistent with the limitation in the will, that the annuity of Harry Devine, Jr., should terminate upon certain conditions. That point is in no way involved herein.

## 2. *Power to Change Trustee.*

The trial court in its first declaration held that the court had jurisdiction to appoint J. C. Underwood as trustee. Neither Underwood nor the State challenges this finding. In fact, the latter, in its reply herein, insisted upon the validity of the appointment. Devine, correctly discerning that Underwood's appointment amounts to a substitution of trustees, challenges the

correctness of the declaration, and insists that the State alone has the right to administer the property, and that ample constitutional and statutory provisions exist for that purpose. We shall consider that contention. There can, of course, be no doubt that the testator contemplated that the property should be managed by the State, through its proper agent or agents. In doing so, it would primarily, as already seen, and as stated in Bond v. State ex rel., supra, act as trustee for the purpose of paying annuities. It is suggested by counsel for Underwood that the State never accepted the grant under the will. But that point is doubtful. The officials of the state managed the property for awhile; the legislature attempted to regulate the holding of the property; the attorney general consented to the appointment of the present trustee, and it may be that the state may be said to have accepted the grant by implication, if not directly. It is further suggested by counsel for Underwood that the State has no power to act as trustee of a trust such as is involved here. It however has, or at least may have, a direct interest in the property remaining after the satisfaction of the annuities provided for in the will, and we are not prepared to hold that the state could not, through its legislature, provide for the administration of such a trust by officers of the state or other agents. In section 95 of the Restatement of the Law of Trusts it is stated: "The United States or a state has capacity to take and hold property in trust, but in the absence of a statute otherwise providing, the trust is unenforceable against the United States or a State." And in comment (d) to that section it is stated that "a state can administer a trust for any purpose unless restrained by the provisions of the Constitution or laws of the United States or of the State." In comment (a) it is said that "as against the United States or a state the only remedy of the beneficiary is by a special act of the legislature, unless a

proceeding in a court of claims or other tribunal is provided by statute." Of course, if this correctly represents the law in this case, on the theory that a proceeding to change trustees in such case is a suit against the State, there is grave doubt that a court has the power to deprive the State of the management of a trust which it has accepted, whether any legislative or other provision for the protection of an outside beneficiary under the trust has been made or not. We do not, however, think that the rule applies under the facts in this case. We should in that connection, perhaps, not overlook Section 2 of Article 18 of the Constitution, which provides that property donated, granted or received from any source shall be inviolably appropriated and applied to the specific purposes specified in the original grant or gifts. Furthermore, the State has acquiesced in the appointment of Underwood, through its officials, including its attorney general. It is in this very proceeding insisting upon the validity of that appointment. The appointment was made in the early part of January, 1933. Three sessions of the legislature have been held since that time; one in 1933, one in 1935, one in 1937, so that our statement in Bond v. State ex rel. Wilson, supra, to the effect that "it may be necessary for the executive officers in possession of the property to invoke the action of the courts for the purpose of executing the trust" has been acquiesced in as not an improper course to pursue. Hence we do not feel that we are called upon at this late date, particularly upon our own initiative, to hold the appointment void on account of the rule stated by the Law Institute and the comments thereto, especially in view of the fact, since no public purpose is expressed in the last will and testament in question, the state, in accepting the trust, seems to act more in the nature of a private than in a public capacity. In fact, none of the parties have asked us to hold the appointment void for

the foregoing reason. It is merely insisted by counsel for Devine that the appointment is void, because ample constitutional and statutory provisions exist for the management of the trust both for the benefit of the State as well as for the benefit of Devine. And we shall proceed to consider that point.

Our attention has been called to sections 103-501 to 504, Rev. St. 1931, which amended Chapter 104 of the Session Laws of 1927. Provision is made for a board of Will Trustees. The board is empowered to investigate and settle contests made in connection with any grant or gift made to the State by will or otherwise. Section 103-503 then proceeds to provide:

"It is made the duty of said board to receive, take charge of and administer all personal chattels heretofore or hereafter received by the state of Wyoming as a devisee, legatee, beneficiary, grantee or by escheat and to convert the same by sale or otherwise, including every evidence of debt or of value so received, into money; also to convert all mortgages, so received, into money according to the terms thereof, by foreclosure or other legal process; and to turn said funds over to the treasurer of the State of Wyoming to be by said treasurer credited to the fund or funds for which the same were directed and intended in such grant, gift or devise; and when not otherwise directed by the terms of such grant, gift or devise, the funds so received by said treasurer shall be credited to the common school permanent land fund."

It may be noted that this section relates to personal property only, and counsel for Devine assert that it makes ample provision for the administration of such property belonging to the Higgins estate. It provides for the payment of the money realized from the disposition of the property into the state treasury. It makes no appropriation of the money for the payment of the annuities; it gives no direction that the annuities must be paid. The difficulties of enforcement of the annuities, accordingly, mentioned in Bond v. State, supra,

are present. The trust fund arising from the personal property cannot be efficiently administered, so far as the annuitant is concerned. Counsel for Devine claim that so far as the real property is concerned, sufficient provision is made in section 3 of article 18 of the Constitution, which provides that the board of land commissioners "subject to the limitations of this constitution and under such regulations as may be provided by law shall have the direction, control and disposition and care of all lands that have been heretofore or may hereafter be granted to the state." And it is claimed that when the lands are administered as so provided, the proceeds must first be applied to the payment of the annuities in accordance with section 2 of article 18 of the constitution, already quoted, as interpreted in Bond v. State, supra. In this connection counsel for Devine have overlooked some constitutional and statutory provisions. Section 7 of Article 16 of the constitution provides that "no money shall be paid out of the State Treasury except upon appropriation by law on warrant by the proper officer." Section 35 of Article 3 provides that "moneys shall be paid out of the treasury only on appropriations made by the legislature and in no case otherwise than upon warrant drawn by the proper officer in pursuance of law." See in this connection MacDougall v. Land Commissioners, 48 Wyo. 493, 49 P. (2d) 663. Section 91-515, Rev. St. 1931, provides for the payment of all money arising from the sale of state lands into the State Treasury to be credited to the permanent funds to which the lands belong. It may be doubtful that this section has anything to do with lands of the character involved herein. The State Board of Land Commissioners does not collect any money directly. It acts through its secretary, the Commissioner of Public Lands. He collects all money and is directed by section 91-202, Rev. St. 1931, to pay all money coming into his hands monthly

to the state treasurer. There is no statutory appropriation of money collected from lands involved in the Higgins estate for the purpose of paying the annuity to Devine; no direction that such annuity shall be paid from the funds which in all events find their way, under the statutes, into the State Treasury, but there is no provision for the way out, so that the trust fund may be efficiently administered in accordance with the terms of the will, in so far as the annuitant is concerned. The only possible theory under which this could be held not to be true is to hold that section 2 of article 18 of the constitution is self-operative; that is to say, that the funds subject to the annuity do not, so long as the annuity is payable, become the property of the state at all; but that the officials of the state will hold the fund in their personal capacity, making a suit against the state, which is not authorized in this case, unnecessary, but making it possible, that the officials could be directed by mandamus to pay the annuities. No such solution has been suggested by any of the counsel in the case, and we should not, doubtful as the point is, want to hold that to be a proper solution upon our own initiative and without full argument, although we might add that, if the proceeding to change the trustee in this case were to be considered in the nature of a suit against the state, the court would naturally be inclined to construe the provision mentioned as self-operative, if that could reasonably be done. We shall, then, for the purposes of this case, treat the situation as though no such solution exists. We find, accordingly, that the state cannot act as trustee efficiently, so as to carry out the beneficent intent toward the annuitant in a proper manner, and without putting too much difficulty in the way of the enforcement of the payment of the annuities. We think that a court of equity has the power, in such a situation, to appoint a trustee other than the one designated in the

will. The court may and should appoint a new trustee whenever the exigencies of the case make that advisable. 65 C. J. 589. We find no precedent for the particular occasion presented in the case at bar, but the principle mentioned cannot be doubted. It has been held, for instance, that where the disagreement of joint donees precluded effective exercise of their power of appointment, the court will oust them, and appoint a new trustee. 65 C. J. 588. So we think that the effective exercise of the powers of a trustee for the benefit of the annuitant, who must be considered as the main object of the testator's bounty, required or warranted the appointment of a new trustee in the case at bar.

### 3. *Proceedings for Appointment of New Trustee.*

Counsel for Devine also contend that the trial court in appointing Underwood as trustee misinterpreted the direction of this court in Bond v. State ex rel. Wilson, supra, acted sua sponte and without a written application for the appointment before it; that such appointment is without jurisdiction and void for that reason, and we are cited to Janin v. Logan, 209 Ky. 811, 273 S. W. 531. It is true that this court in the Bond case stated that the State should administer the property as a trust fund, but it was further stated that the legislature would probably enact proper legislation designating the officers or persons who should manage the property, or that it might be necessary for the administrative officers then in control of the property to go before the proper court and invoke its action for the purpose of having the trust executed. In other words, the court did not definitely indicate the manner in which the trust should be administered, leaving that matter to be determined in the future. The only point in this connection which was definitely decided in that case was that the trustees of the University should not have control of the property. Hence the decision of

this court in that case is not controlling on the point as to whether or not the appointment of Underwood is void.

It is true, as contended, that courts do not ordinarily act sua sponte, but only upon the filing of a written application or petition showing at least that the court has jurisdiction of the subject matter. State v. District Court, 33 Wyo. 288, 290, 238 Pac. 545; Freeman on Judgments, (5th Ed.) Sec. 355; 15 C. J. 797. And, doubtless, it would have been much more satisfactory if that course had been pursued in this case. In Williams v. Neil, 4 Heisk. (Tenn.) 279, it was held that a substitution of a trustee could not be made on a mere motion. We shall not stop to analyze that case. It is not very satisfactory in its conclusion. See Haggin v. Strauss, infra. In Schwitters v. Barnes, 157 Ill. App. 381, it appears that a trust was created for the benefit of the testator's widow and his children. The trustees appointed under the will resigned, and the widow filed a motion in the matter of the estate of the deceased, asking for the appointment of a trustee in substitution of those appointed under the will who resigned or refused to act. It was held that a motion was not the proper procedure; that a petition should have been filed showing the jurisdictional facts. The order of the court substituting a trustee was held void. We think, however, that the main reason therefor was the fact that the children were not made parties or cited into court. They were held to be necessary parties to the proceeding, the court stating that the procedure adopted in the case "violates the fundamental principle that courts may not dispose of the rights of anyone without notice pursuant to law and a hearing." In Janin v. Logan, supra, cited by counsel for Devine, the beneficiaries of a trust filed a petition asking the appointment of trustees additional to those appointed under the will and who were then acting. The acting

trustees were not made parties, and no notice of the petition was given them. The petition did not show any reasons for the appointment of additional trustees. It was held that the court lacked jurisdiction to act upon the petition. We think rightly so. It may be readily conceded in the case at bar that if the trial court had attempted to arbitrarily displace the state or its officers as trustees without notice and against their consent, the order of displacement would have been void, at least if attacked within a reasonable time. But that is not the situation here, as will be noted hereafter.

The attack in this case on the appointment of Underwood as trustee is a collateral one. That is conceded, and hence it is not a question whether the appointment was irregular, but whether or not in this particular case, the court had, under the circumstances disclosed herein, no power whatever to appoint a trustee. 65 C. J. 603. The district court is a court of superior and general jurisdiction, which includes jurisdiction to appoint trustees to administer a trust. 65 C. J. 584, 589. The attack herein being collateral, as already stated, the court's jurisdiction in this case will be presumed, unless the contrary appears from the record itself, or, perhaps, is shown aliunde. 15 C. J. 838. The fact that no written application for the appointment of Underwood was filed should not, we think, of itself defeat the power of the court to appoint him. In Haggin v. Strauss, 148 Ky. 140, 146 S. W. 391, 50 L. R. A. N. S. 642, the court stated that one of the beneficiaries of the trust "might have gone into the county court * * * and upon motion, had a suitable person appointed trustee." While the point is not directly mentioned, we doubt that the court meant to hold that the "motion" necessarily implied a written one. For the court also said that "those interested in the trust fund and its management can do no more than call the court's attention to the fact that there is a vacancy in the office

and ask that it be filled. The duty then devolves upon the court to select a suitable person." In the case of Andrews v. Snyder, 223 Ill. App. 335, 340, it was held that a court has the power to appoint a substitute trustee after consultation with the attorneys of the respective parties—in other words, though no written application has been filed. Parties may by consent dispense with matters which otherwise would be essential. We have held, for instance, that parties may voluntarily enlarge the issues made by their pleadings. Willis v. Willis, 48 Wyo. 403, 421, 49 P. (2d) 670, 675; Urbach v. Urbach, (Wyo.) 73 P. (2d) 953, 113 A. L. R. 889. And they may, we think, by consent, dispense with written pleadings entirely, at least to the extent that they cannot attack a judgment rendered in such a case collaterally on the ground of the lack of written pleadings. 49 C. J. 33; Johnson v. Miller, 50 Ill. App. 60, 70; Alber-Wickes etc. Co. v. Freiburg Passion Play, 141 Misc. Rep. 480, 252 N. Y. S. 209. Thus it was said in Johnson v. Miller, supra, that "a court cannot act sua sponte; some party must in some way call upon it to act; but the power of the court of superior and general jurisdiction to pronounce judgment, when proceeding according to the course of the common law, does not necessarily depend upon the existence or the filing of written pleadings by the parties." We stated in Claughton v. Johnson (on rehearing) 47 Wyo. 536, 544, 41 P. (2d) 527, that "pleadings are but a means to an end and not an end in itself, and that, while parties are entitled to know the claims of their adversary, no cause of complaint exists when that purpose has in any manner been subserved, and when no prejudice results from lack of allegations, provided, of course, that a cause of action exists in fact and has been shown." That rule should apply to an application as well as to any other pleadings, and should, we think, be applicable here.

The evidence in the case seems to indicate that the State and its officers did in fact, through the attorney of the State, make an oral application to the court for the appointment of Mr. Underwood as trustee. He conferred with the court, it seems a number of times in that connection. So that for this reason alone, the appointment should not, in accordance with Haggins v. Strauss, supra, be held to be without jurisdiction. This court, in Bond v. State ex rel. Wilson, supra, had directed the trial court to modify its judgment in accordance with the opinions expressed by this court. The trial court, then, had the power to modify its judgment in that case. In doing so it had jurisdiction over the parties in the case, which included the state, one of the beneficiaries of the trust, and the officers of the state who then administered the property. The direct order appointing Underwood appears to be a continuation of the modifying judgment. While that is not clear, it is not questioned, and we shall assume that to be the fact. Was the appointment of a trustee reasonably involved in the modifying judgment? If so, the order was not without jurisdiction, as held in the case of In Re Ingram's Estate, 104 Cal. App. 1, 285 Pac. 365. The court was confronted with the fact that a trust had been created. The trustees of the University were excluded from administering the property. The legislature had not enacted a law designating the persons who should manage it. As heretofore shown, the trust could not be efficiently administered by the officers of the state under the existing law. Could it not be said that under these circumstances the proceedings already before the court fairly gave rise to the power to appoint a new trustee? That point is, perhaps, not as clear as it might be, but let us consider other facts. The district court in the modified judgment in the Bond case stated, as pointed out by Devine, that the trust was "to be administered as such by the State of

Wyoming under and by authority and direction of this court." This provision, however, is clearly inconsistent with a subsequent provision of the same modified decree wherein the court directed that all the property of the estate "shall be in the custody of this court and shall be administered, handled, used and managed by some one designated to act under authority of this court for said purpose." By this order the court directed, substantially, that the state should not act as trustee, and this direction was made effectual by its further order of January 7, 1933, by which Underwood was appointed. The state, one of the beneficiaries under the will, and then before the court, made no objection to such orders. As already shown, the evidence indicates that the attorney general on behalf of the state and its officers, consulted with the court a number of times and made an oral application for Underwood's appointment. Let us repeat that the state has acquiesced in that appointment ever since, and in the instant action, in its reply, insists upon the validity of the appointment. In view of these facts, this court cannot be asked to hold that the appointment is void in so far as the state is concerned. And Devine cannot rely upon any right upon which the State might have relied. If the appointment is void, it must be because Devine, the only other beneficiary under the will, was not made a party to the proceeding. Under Schwitters v. Barnes, supra, that would apparently be the result, at least if he insisted that he should have been made a party, and that the appointment is void on account of the failure to do so. The general rule, however, seems to be that not all beneficiaries are necessary parties. Bogart, Trusts and Trustees, Sec. 532, p. 1697; 65 C. J. 601. Moreover, we have the anomalous situation here, that Devine does not complain that he was not made a party, and merely insists that the appointment was void for the reason that no written application for that

purpose was filed. That contention, as we have seen, is not well taken, and his objection, now under discussion, should, accordingly, be overruled on that ground alone. We might add, however, that, according to the better view, the appointment would at most be voidable only as to Devine. Sawyer v. Banfield, 55 N. H. 149; Haggin v. Strauss, supra; 65 C. J. 601. Hence his objection would at most be of avail only in a direct proceeding to set the appointment aside, and cannot be sustained in this case. We might add further that counsel for the trustee argue earnestly, citing many authorities, that he should be held estopped from questioning the appointment, because he has at numerous times recognized it and has received benefits under it. We need not go into that question.

### 4. Title of Old and New Trustee.

The appointment of Underwood as trustee being valid, at least as against a collateral attack, where is the title to the property? The trial court in its second and third declarations held that it is in Underwood, for the purpose of paying the annuities to Devine and thereafter to convey whatever property is remaining to the State, and that he has all the ordinary powers of a trustee. All three of the appellants insist that under the will the title to the property is clearly vested in the State, and that it, and it alone, accordingly, can convey it to another. Of course, that contention would be correct, if the State had not been given the title to the property, primarily at least, as trustee. Holding it as such changes the situation, and it seems that the State and Underwood take exceptions to the foregoing findings upon a misapprehension of the legal effect of Underwood's appointment. Counsel for Devine further call our attention to Section 109 of the Restatement of the Law of Trusts, and were it not for that section, we should not have had any great difficulty in the solution

of the point now before us. The section reads as follows:

"If the court appoints a new trustee, the title to the trust property will not vest in the new trustee until a transfer is made to him by the old trustee or other holder of the title to the trust property, unless it is otherwise provided by the terms of the trust or by statute."

In the comment thereto, it is stated:

"By statute in almost all of the states provision is made for the vesting of title to the trust property in the new trustee; in many states the mere appointment of a new trustee by the court vests the title in him; in other states the court can by its decree vest the title in the new trustee; in other states the court may appoint a person to make a conveyance which shall vest the title in the new trustee."

According to the comment, then, the rule stated in the main text prevails in few, if any, jurisdictions, and we should, therefore, have welcomed a statement by the learned Reporter of the reasons of its adoption by the Law Institute, for we have no statute regulating the matter, although under section 88-1401, 1403, Rev. St. 1931, the court, apparently acting in probate matters, seems to have been given the power to substitute a new trustee for one who has defaulted in his actions or who has removed from the state. Section 109, supra, is supported by Washburn on Real Property (6th Ed.) Section 1479, where the author states:

"But in the absence of a special statutory provision, the interest and estate of a trustee can only be divested by a conveyance thereof, even though he be removed from his trust and another appointed by the court in his place. To complete the appointment of such new trustee, the court directs and requires the one in whose place he is appointed to execute a proper conveyance of the legal estate to the new trustee. And the abandonment of a trust by one of two trustees does not vest his title in the remaining trustee."

A similar statement is found in Perry on Trusts (7th Ed.) Sec. 284, and cases stating that to have been the rule at common law are found in 65 C. J. 636, note 27. And see Culross v. Gibbons, 130 N. Y. 447, 451.

The first case on the subject seems to have been O'Keefe v. Calthorpe, 1 Atk. 17, 26 Eng. Rep. 12. In that case (in addition to making an order of conveyance) the chancellor stated to "let the appointee take such interest as the law will give him; for I shall not lend him the assistance of this court to make such appointment more effectual than it will be at law." In Peabody v. Eastern Methodist Society, 5 Allen (Mass.) 540, the court held that the new trustees took no title without conveyance to them because there was "no privity of estate between them and the trustees who took the land by deed and could have no effect in law to divest or change the title." In Corbett v. McNutt, 18 Gratt. (Va.) 666, 690, and West v. Fitz, 109 Ill. 425, 443, it is held that each state controls the title to its property and hence a foreign court by its decree, or a foreign statute, cannot divest the old trustee of his title to property situated in another state. These cases are not applicable here, since the property in the case at bar is wholly situated in this state. In Coffman v. Gates, 110 Mo. App. 475, 85 S. W. 657, the court stated that "there is no clause or terms in the decree divesting the title out of Ghio (the old trustee) and investing Barada (the new trustee) therewith; in the absence of such words indicating an intention to divest and invest title the decree cannot have that effect. McKinny v. Settles, 31 Mo. 31; Washburn on Real Property, Sec. 2087." The authorities cited in Coffman v. Gates merely hold that in order to constitute a transfer, certain formalities are required. The case takes a step in advance of O'Keefe v. Calthorpe, supra, for while they both agree in the fact that the trustee takes no title without a conveyance, the Missouri court recog-

nizes the rule that the court itself may make an order which operates as such by its own force. That rule is also recognized in Faulkner v. Davis, 18 Gratt. (59 Va.) 592, 98 Am. Dec. 698, and by other courts where the necessity of the case requires it, as, e. g., where the old trustees are out of the jurisdiction of the court. Smith v. Smith, 3 Drew. 72, 61 Eng. Rep. 829; Cases 65 C. J. 637, note; See Koehne v. Beattie, 36 R. I. 316, 328, 90 Atl. 211. Another exception to the original rule has been recognized by some of the courts, namely, when the will itself provides for the appointment of a substitute trustee to execute the trust. In such case "the new trustee becomes vested ipso facto with the title to the trust premises and is clothed with the same power as if he had been originally named in the will. No conveyance need be made to him by the former trustee." Yates v. Yates, 255 Ill. 66, 99 N. E. 360; Ann. Cas. 1913 D. 143 and cases cited; Stein v. Safe Dep. & Trust Co., 127 Md. 206, 96 Atl. 349; 65 C. J. 636-637. That rule does not seem to be recognized by the Law Institute, which, in section 110 of the Restatement of the Law of Trusts holds that "if a new trustee is appointed by the exercise of a power conferred by the terms of the trust the title to the trust property will not vest in the new trustee until a transfer is made to him by the old trustee," unless the trust instrument specifically provides that the title shall pass in such case.

Some of the cases go further and hold that the new trustee becomes vested with the title by implication of law. 65 C. J. 65, note 25. In Freeman v. Prendergast, 94 Ga. 369, the court said:

"Under the English practice, when there was a change of trustees there was a formal conveyance from the old to the new trustee. It was therefore properly said in Hill, Trustees, p. 196, that 'the appointment of the new trustee by the court would not be complete without a conveyance or transfer of the trust property

to him.' The decree therefor usually goes on to direct a proper conveyance of the legal estate.' Under our system, however, there is no formal conveyance from the old to the new trustee, but the title passes to the latter by virtue of his appointment."

Apparently the same rule prevails in Iowa. Parkhill v. Goggett, 135 Ia. 113, 112 N. W. 189. We cannot find a statute in either case which would control these decisions. Nor are we able to find a statute which definitely controls the point in New York, but the rule that no conveyance from the old to the new trustee is necessary seems to prevail in that state. Toronto General Trust Co. v. Chicago etc. R. Co., 123 N. Y. 37; Stokes v. Amerman, 7 N. Y. S. 733; Bloodgood v. Life Ass'n., 19 Misc. Rep. 460, 44 N. Y. S. 563; Coster v. Coster, 125 App. Div. 516, 109 N. Y. S. 798, where the court said that "there is no person who can convey, nor is there any propriety in a conveyance, because a substituted trustee takes title by virtue of his appointment, and not through a conveyance." (But see Culross v. Gibbons, 136 N. Y. 447.) The case of Woodridge v. Planters Bank, 1 Sneed 297, was decided by the Supreme Court of Tennessee in 1853. At that time there was in force in that state a statute passed in 1831, which provided that a trustee might be removed and another substituted, without saying anything about the title. The court in the foregoing case considered that matter, stating:

"The decree accepting the resignation of Walker and discharging him of the trust, and appointing White in his stead, is silent as to the title of the trust property; it does not in terms, either divest the legal title out of Walker or vest it in White, and the act of 1831, under which this proceeding took place, contains no provision for a change or transfer of the title to the trust estate, from the trustee who is permitted to resign to the successor appointed by the court. What then becomes of the legal title to the trust property, upon the resignation of the trustee? This is a question by no means free

from difficulty. To hold that the title still remains in the trustee, after he is formally discharged of the trust, would seem to be absurd. Upon this construction of the act, the resignation of the trustee and the appointment of another in his stead, would be alike inoperative; because, while it would fail to discharge the first trustee effectually, from all future liability, it would leave his successor destitute of the power of exercising legal control over the trust property, for the want of title. To give the act any sensible construction or effect, it must be held, therefore, that upon the discharge of the first trustee, by implication of law the title is transferred to and becomes vested in the successor appointed by the court; and for the same reason, a like construction and effect must be given to the decree of the chancellor in the present case."

That case was approved by the same court in Hughes v. Brown, 88 Tenn. 578, 583. The point is fully considered in Bogert on Trusts and Trustees, Section 532, where the author states:

"Upon appointment, the successor trustee succeeds to the title of the trust property without the necessity of a conveyance, and, unless some of the powers were personal to his predecessor or the court limits the powers conferred on him, he has the same powers that his predecessor had. The Massachusetts court has stated that at common law a conveyance was necessary, and occasionally courts have required it. Particularly, where some of the trust property consisted of foreign realty, has the automatic transfer of title been questioned. But the prevailing theory seems to be that, when an appointment is made, title is transferred, not by the authority of the court, but by operation of the trust instrument. Upon that theory the appointment can operate as a transfer of all property without regard to its nature or location."

It is apparent from the foregoing that the law on the point here considered is in a state of confusion. It is one of first impression here. And while we should ordinarily prefer to accept the rule adopted by the Law Institute, we hesitate to do so in a case in which this rule is applicable in but few, if any, jurisdictions, as

seems to be true in this instance. We do not wish to make the confusion greater than it is. The rule follows the early English practice, as shown in O'Keefe v. Calthorpe, Perry on Trusts and Washburn on Real Property, supra. It would seem that the origin of the rule, the reason therefor, to express it more clearly than in the authorities already cited, was based on the further rule that ordinarily a court of equity operates in personam and does not create or transfer a title. 21 C. J. 691; 58 C. J. 1276. And if it is a question of *power*, we should adhere to the rule of the Law Institute. If it is merely a question of practice or procedure, then we should be able to establish in this state, in the absence of legislation on the subject to the contrary, a rule which accords with the thoughts and idea of the present day. It must be borne in mind that if a substitute is appointed for a trustee, the latter retains at most but a mere naked legal title. National Webster Bank v. Eldridge, 115 Mass. 424; Sterns v. Fraleigh, 39 Fla. 603, 23 So. 18; 39 L. R. A. 705; Stokes v. Amerman, 55 Hun. 605, 7 N. Y. S. 733. And it was stated in McNish v. Guerard, 4 Strobhart Eq., 73, 80, nearly ninety years ago, that "the conveyance (to the new trustee) must be regarded as a merely formal act." If that is so, does the want of power, nevertheless, prevent us from cutting the Gordian knot? In this connection we should note carefully that the chancellor in O'Keefe v. Calthorpe, supra, stated merely that he would not lend his assistance to make the appointment of the trustee more effectual than it would be at law. He did not hold that he did not have the *power* to do so. And whatever may have been the practice in early times, courts of equity have in modern times relaxed the rule that such court can operate only in personam, but have in some cases at least had their judgments operate in rem. That is true not only in the cases cited which hold that the title to property held in trust will

be transferred to the new trustee by implication of law, including cases which hold the title is so transferred in cases of necessity, but also in cases for the removal of clouds of title. Tenant v. Fretts, 67 W. Va. 569, 68 S. E. 387, 140 A. S. R. 979; 29 L. R. A. N. S. 625, which cites numerous cases and which expressly holds that the "decree of a court of equity may be made to operate in rem to the same extent and in the same manner as judgments at law." See also the rule in Coffman v. Gates, supra, and Falkner v. Davis, supra. Hence the prop sustaining the rule laid down in the Law Institute as above mentioned has been weakened, if not totally destroyed. Pomeroy on Equity (4th Ed.) mentions, in section 134, the rule that a court of equity acts only in personam, and the results which are supposed to flow therefrom, including the point that title cannot be transferred by such court. He states what he thinks of the arguments in support thereof, in Section 135 as follows:

"There may be some plausibility in this argument on its surface, but when it is examined with care, and under the light of history, all its force disappears. The early chancellors, from prudential motives alone, and to avoid a direct conflict with the common-law courts, adopted this method of acting, as they said, upon the consciences of defendants; and the practice which they invented has, with the English national devotion to established forms, continued to modern times. But it is certainly a complete confounding of the essential fact with the external form, to say that such a mere method of procedure, adopted solely from considerations of policy, determines the nature of the equitable jurisdiction, and demonstrates the non-existence of any equitable primary rights, estates, and interests. If there had been any *necessary* connection between the proceedings and remedies of chancery and this mode of enforcing its decrees *in personam,* if it had been intrinsically *impossible* to render these decrees operative *in rem,* then the argument would have had some weight; but in fact there is no such connection, no such impossibility; the decrees of a court of equity may be

made to operate *in rem* to the same extent and in the same manner as judgments at law."

These considerations render it unnecessary, we think, or inadvisable, for us to adopt the rule of Section 109 of the Law Institute above mentioned, and we believe that in any event no more is necessary than a decree divesting the title of the old trustee and investing the new trustee therewith. That is particularly true in this case, where, if the rule of the Law Institute were adopted, it would require a special legislative act in order that the title might be transferred to the new trustee. And there are further points to be considered. The question of title, if it matters at all, which is doubtful, is not of the same importance in this case as in cases in which the trustee sells property without an order from court. It is stated in 65 C. J. that a trustee can pass no greater title than he possesses. That is doubtless true in cases where he makes a conveyance upon his own initiative. The cases cited seem all to relate to a situation of that kind. Here we have a different situation. The will does not direct or authorize the trustee to sell the corpus of the property, and the rule seems to be that it cannot be sold in such cases without an order from court. 65 C. J. 730-31. "A decree of a court of competent jurisdiction on an application to sell trust property from which no appeal is taken is a conclusive adjudication and cannot be collaterally attacked. The order and decree is binding on all the parties and persons whose interests were represented." 65 C. J. 751. It is said in 65 C. J. 778 that "where sale and conveyance was made under decree of court, the interest of all the beneficiaries who were parties to or were represented in, the proceedings, pass." The same rule obtains in cases of judicial sale, for it is said in 35 C. J. 73 that "with respect to property sold at a judicial sale, the decree and deed convey all the title and right of those who are parties to the

suit and are bound by the decree." And it would seem that a sale by a trustee under the circumstances mentioned is in some respects at least analogous to a judicial sale (35 C. J. 10; Mitchell v. Title Ins. Co., 79 Cal. App. 345), in which the person who effects the sale is but the agent of the court. 35 C. J. 8.

It happens in the case at bar that the State was not only the old trustee, but is also a beneficiary under the will. Hence, in order that it may be bound by any decree of sale, it must be notified of the proceedings, or it must appear therein. If the court, in such proceeding, under the proper circumstances and facts, makes an order of sale, it would be bound by the decree (unless an appeal is taken) at least as such beneficiary. It is the duty of the court in such proceeding to protect the purchaser and perfect his title, if it may be done. Copeland's Executors v. Copeland, 145 Va. 33, 135 S. E. 707. It is held in the case just cited that a trustee who is a party to the proceeding is bound thereby (unless, of course, an appeal is taken). We have no reason to differ from that holding, and the rule of that case would seem to include not only the new trustee, but the old trustee as well, if such old trustee may be said to be still possessed of the naked title to the property. Hence it is unnecessary to decide whether the new trustee should be held to be vested with the title by implication of law, or whether an order to that effect should be entered. We might mention that no good reason appears why such order could not still be made in any future proceedings for the sale of the property, at least if that point is properly raised.

5. *Power to Sell and Convert.*

The court declared in paragraph four of the decree as follows:

"That in order to preserve and safeguard said trust and the property thereof from loss and depletion, said trustee should proceed as rapidly as may be, under the

direction and supervision of the district court of the seventh judicial district of the State of Wyoming in and for the county of Converse, to convert all of the property of said trust into cash for the purpose of satisfying all valid claims now outstanding against the trust and to invest the balance of the proceeds therefrom in the purchase of such securities as are designated under the constitution and statutes of the State of Wyoming as being proper and authorized investments by trustees, but in no event to be invested in annuities in any private corporation."

This provision of the decree is an order rather than a declaration of power, or rights or duties, and seems to go beyond the prayers of the petition. None of the parties, however, have taken any exception thereto, and have acquiesced therein, except as to matters already discussed, namely, that the State, rather than Underwood, should sell the property, and we shall not, accordingly, mention this provision further. It is connected with that part of the petition which alleges the necessity of the sale of the property of the trust and the conversion thereof, and with that part of the third declaration of the court which states that the trustee should proceed and sell and convert the property, and we shall briefly discuss the power to do so, in view of the fact that, though all parties agree that this should be done, the point has been argued at length, and they seem to want the view of this court thereon.

The will in question in this case does not contain an express power to sell. But that is not controlling. The general rule is stated in 26 R. C. L. 139, that "a court of chancery has to some extent, a general supervision over trust estates and may direct such a disposition as in its discretion seems beneficial to all parties interested, even going so far as to order the sale of the trust estate and a reinvestment of the proceeds without authority being given by the trust instrument, if the conditions are such that it is manifestly in the interest of the trust estate." And in 65 C. J. 744, it is stated

that without permissive statutes, a court of equity has inherent power "not only in cases where the trust instrument confers a power of sale on the trustee, but in cases where it does not, to order or prohibit a sale of trust property where such action is necessary to the execution of the purpose of the trust and for the protection of the estate and the rights of the beneficiaries." The rule goes even further, and a court of chancery may at times order a sale of property even though such sale is expressly forbidden by the trust instrument. 65 C. J. 746; note 77 A. L. R. 971; Restatement of the Law of Trusts, Sections 167 and 190. As stated in Curtis v. Brown, 29 Ill. 201, 230, one of the first cases on the subject, "from very necessity, a power must exist somewhere in the community to grant relief in such cases of absolute necessity, and under our system of jurisprudence that power is vested in the court of chancery." The power of the court, in order to preserve the trust estate, has been well stated in the case of Johns v. Montgomery, 265 Ill. 21, 106 N. E. 497, where the court said:

"In regard to the jurisdiction of courts of chancery to direct the conversion of real estate into personal property, and vice versa, and to decree other modifications of trust agreements when it becomes necessary to preserve the trust estate, it may be stated as a general proposition that, while the power is exercised with great caution, it has become a well-established rule that, when the courts can see that unforeseen conditions have arisen which make it necessary, to preserve the rights of beneficiaries under trust instruments, to change the terms of the trust, courts of equity have not hesitated to direct such necessary modifications as will preserve the trust estate for the use of the beneficiaries."

(See also article by Austin Wakeman Scott in 44 Harvard Law Review 1025.)

There was evidence in the case that the property of the trust should be sold and converted, and, as already

stated, all parties concede that this should be done. We might add, that we do not express any opinion on that portion of the decree directing the character of future investments. That point has not been argued herein.

6. *Power to Mortgage.*

The court in its declaration No. 5 found:

"That said trustee is without power and authority in the present financial condition of the trust and the present condition of the various properties making up the trust to borrow money and pledge the property of the trust by way of mortgage or otherwise."

Just what the court had in mind in making this declaration is not altogether clear. Seemingly it did not mean to declare that the property might not be mortgaged under any conditions whatever, for the declaration states that the power does not exist "in the present financial condition of the trust and the present conditions of the various properties." It may be that the court meant to find that the situation of the trust-property at the present time is such that to mortgage it now would be unjustified. If that is its meaning, we are not, of course, in position to say that such finding is wrong. In fact, if we were to express an opinion on the point at all, we should say that the trial court was probably right, since the power to mortgage should not, we think, considering the situation of the property as we find it in the record, be resorted to except in the extremest need, since there seems to be considerable danger that there is a lack of funds with which to redeem any mortgage.

Counsel in the case seem to construe the finding of the court broader than above mentioned. So we shall discuss the law in that connection. There is no power to mortgage given in the will of the deceased, or in the decree admitting the will. If, then, the power exists, it is implied under certain circumstances. Ordinarily

no such power exists. 65 C. J. 785. In 26 R. C. L. 1303, it is said that "a trustee cannot mortgage the trust property unless power to do so is expressly given him by the trust deed, or an intent to confer the power can be implied from its terms and the circumstances surrounding the trust." But the rule is not absolute. Under certain circumstances, the trustee, when acting under order of court, may mortgage the trust property. 65 C. J. 788; Restatement of the Law of Trusts, Sections 167 and 191. In Bogart on Trusts and Trustees, Section 762, the author states the rule to be as follows:

"The power is inherent in the court of chancery, independent of statute and in the exercise of its general jurisdiction over the administration of trusts, to authorize a trustee to borrow money and to secure the loan by a mortgage of the trust estate in certain cases. * * * Unless the trust instrument grants the necessary authority to the trustee, the exercise of the power of the court to authorize a mortgage generally has been confined to cases of exigencies in which a mortgage was essential to the continuation or carrying out of the trust. * * * An outstanding example of the exercise of the power is the granting of authority to mortgage for the purpose of paying off liens and incumbrances in order to save trust property for the cestui que trust. The courts have commonly given the trustee permission to incumber the trust property where it was necessary to raise money to pay taxes and thereby avoid a tax sale, or to redeem property which has been sold for taxes."

Many authorities bear out the foregoing statement. Scott v. Mussafer, 223 Ala. 153, 134 So. 857; Butler v. Badger, 128 Minn. 99, 150 N. W. 233; Inman v. Crawford, 89 Fed. 232; Burrows v. Gaither, 66 Md. 171, 7 Atl. 243, 251; United States Trust Co. v. Roche, 116 N. Y. 120, 22 N. E. 265; Rutherford v. Larned, 102 Ga. 501, 28 S. E. 1019; Shirkly v. Kirby, 144 Ky. 159, 137 S. W. 38; Bell v. Bell, 44 Ariz. 520, 39 P. (2d) 629; 65 C. J. 788.

In Burrows v. Gaither, supra, the court stated:

"When the court, therefor, upon assuming control of the trust, found that all this large real estate had been sold for taxes for a sum merely nominal in comparison with its value, and that the title to it was about to pass to strangers, the effect of which would be to break up the trust, it became its duty to act at once for the benefit of the *cestuis que trust,* most of whom were then minors, and take advantage of the privilege of redemption secured by the tax laws. Under such circumstances, and where there was no other means of raising the necessary funds, we are of opinion the court had the power to sell or mortgage a part, in order to rescue the whole, or as much of it as possible, from this impending *vis major.* It was a power derived from the necessity of the case, and one which every prudent owner would use if he found his property in such a dangerous position. These *cestuis que trust* were the equitable owners of the property, and a court of equity was managing it in their interest, and for their benefit; and in such an emergency, and for such a purpose, we think the court was clothed with all the powers of absolute ownership."

In Scott v. Mussafer, supra, in which the court permitted a mortgage to be made in order to erect improvements, the court stated:

"Generally an executor of an estate cannot mortgage the property of his testator unless given the power to do so by the terms of the will or by a statute. Jones on Mortgages (8th Ed.) § 132; Kirkbride v. Kelly, 167 Ala. 573, 52 So. 660. The present will, however, while not giving the executor power to sell or mortgage the real estate, does more than give executorial power, as it creates a trust for the use and benefit of the named beneficiaries, and enjoins upon the executor the duty of keeping the estate together and the management and control thereof for a period of years, that is, until the youngest child reaches maturity. Creamer v. Holbrook, 99 Ala. 52, 11 So. 830. The supervision of the administration of trusts is a well-recognized ground of equity jurisdiction. 26 R. C. L. § 133, and resort must be had for this purpose to a court of equity, the probate

court having no jurisdiction over said trust. Creamer v. Holbrook, supra. While the authorities are not entirely harmonious, it seems settled by the weight that a court of equity will authorize a trustee to mortgage the trust property when necessary to discharge existing debts or incumbrances and when to do so is essential to a continuation of the trust or the carrying out of the purpose of same, or, in some instances, for the improvement of the trust property, especially when it enhances the value thereof and increases the income from the same."

It is apparent from what we have said that if the court's declaration was meant that no mortgage can ever be given on the trust estate, it is too broad, and must be modified as herein indicated.

### 7. *Taxation.*

The court declared "that the property forming a part of and belonging to said trust is now and at all times since the death of John E. Higgins, deceased, has been subject to state, county and municipal taxes." The correctness of this declaration is challenged. Exemption from taxation is claimed on the ground that under the will the property was devised and bequeathed to the state, and that the final decree entered in the estate matter is in conformity therewith. Section 115-102, Rev. St. 1931, exempts property belonging to the state from taxation. We think that our answer to the question as to whether or not the property in question here is state property within the meaning of this statute has already been foreshadowed by what we have already stated. It is stated in 61 C. J. 366 that "the public property which is thus immune from taxation includes all property, real and personal, held for public purposes, which legally or equitably belongs wholly to the state, no matter on what basis its title rests. But the immunity extends only to such property as may properly be said to belong to the state, and it is not sufficient that the state may have some indirect or

expectant interest therein." In 61 C. J. 418 it is stated that "property held by the state as trustee for the benefit of others is not exempt." To the same effect is Cooley on Taxation (4th Ed.) Sec. 629; Comstock v. Boyle, 144 Wisc. 180, 128 N. W. 870; People v. University, 328 Ill. 377, 169 N. E. 811; McChesney v. People, 99 Ill. 216; City of St. Louis v. Wenneker, 145 Mo. 230, 47 S. W. 106, 68 A. S. R. 561. Some of these cases relate to property held by a municipality, but the principle involved is the same. The property of the Higgins estate may still further depreciate in value, and the State ultimately receive little or nothing. At the present time, the property is held in trust primarily for the benefit of Harry Devine, Jr., and we can see no good reason why, as long as his interest therein continues, it should be exempt from taxation.

8. *Interest on Annuity.*

The court in one of its declarations stated that "Harry Devine Jr. is entitled to interest, at the legal rate, on all past due annuities from the time that annuities accrued and became due and payable." The authorities are not in accord as to whether interest is payable on unpaid annuities, and it seems that in England and Canada, interest is not ordinarily allowed. The author in 3 Amer. Jur. 829 states that "in this country the weight of authority supports the conclusion that interest upon arrearages of annuities is recoverable from the time the installments of the annuity become due and payable." We think that we should follow this rule, particularly in view of our statute (section 58-104, Rev. St. 1931) which provides that on money "due and withheld by unreasonable delay of payment, interest shall be allowed at the rate of seven per cent per annum." The statute does not seem to contemplate that financial difficulties of the debtor should be a sufficient excuse for non-payment.

The court did not decide as to the due date of the yearly payments. Counsel for Devine claims that the first payment was due on the date of the death of the testator under the provision of the decree closing the estate to the effect that "Harry Devine Jr., * * * is hereby awarded the sum of $1000 per year for a period of 50 years from the death of said testator." That, however, merely means that the annuity should be paid at some time during the first year after the testator's death. It is stated in 2 Amer. Jurisprudence, that "if the instrument contains no other provision for the time of making payments than that they are to be paid annually, it is lawfully performed by the payment of a single installment at the end of each year, and cannot be construed as a promise to pay such sum in advance, or at the commencement of each year, unless the language of the instrument creating the annuity may properly be construed as providing for such a time of payment. Likewise where an annuity is given by will, it begins to run from the death of the testator, and ordinarily, the first yearly payment is not due until the end of a year from the death, unless there are circumstances or expressions in the will evidencing a different intention." There is nothing in the will in question here, or in the decree, which would vary this rule, and we see no reason why we should differ with it. No compound interest, of course, should be allowed, and none is claimed.

### 9. *Counsel Fees.*

Harry Devine Jr. asked the court to allow him counsel fees for participating in this proceeding. The court refused to do so, and he complains of this ruling. A number of cases sustain the right, or at least the discretionary power of the court, to make such allowance to necessary parties in cases for the construction of a will or a trust, aside from allowance of such fees to

fiduciaries. 69 C. J. 905-908; Perry on Trusts (7th Ed.) Sections 476a and 747a; note 37 Ann. Cas. 716. Some of the cases so holding are based upon a statute and would not be authority herein, since we have no statute authorizing such fees. The rule seems to have arisen under a statute enacted in the time of Richard II, permitting the chancellor to "allow *damages* according to his discretion to him which is troubled unduly." It is held in Re Donges' Estate, 103 Wisc. 629, 79 N. W. 1073, 74 A. S. R. 910, that this statute has been superseded at least in the Code states by the statutes relating to costs—these statutes making no provision for such fees. In that case the court held that no such fees as claimed herein are allowable, stating in part:

"No good reason is apparent why the expenses of a litigant as to his ownership of property should receive the attention of the court or be paid by another when the litigation takes the form of construing a will, any more than if the same issue were tried in ejectment or replevin; but no one would contend that in the latter case any power to make such order existed in the court. Where parties are sui juris, and each litigating for the promotion of his own interests, each should bear the expense, as he will enjoy the fruits of his own contention; and the existence of a fund over which the court has control in no degree varies the principle involved or justifies infraction thereof."

See also Downing v. Marshall, 37 N. Y. 380. We need not say whether the statute of Richard II above mentioned should be held to be in force in this state or not. That statute does not give an absolute right to such fees as claimed herein, and gives but discretionary power, so that, in any event, unless we could say that the court abused its discretion, we cannot interfere. See Perry, supra, Sec. 747a. We do not think that we can hold that such discretion, if it exists, was abused. It is held by at least some of the authorities that unless the services rendered are beneficial to the entire estate,

as distinguished from services rendered for and inuring only to, the benefit of one or more of the beneficiaries, no such counsel fees as claimed herein can be allowed. 69 C. J. 906; City Bank & Trust Co. v. Caa, 213 Ala. 579, 105 So. 669; See Harnett v. Langan, 282 Mo. 471, 222 S. W. 403. We think that in this case the services rendered by counsel for Devine are primarily for their client's benefit. That is true, for instance, in connection with the question as to whether or not the annuities are payable, if necessary, out of the corpus of the estate, and that interest should be allowed on annuities not paid when due. Their contention, further, that no taxes are payable out of the estate, is made for the purpose of protecting these annuities. The claim that Underwood's appointment is invalid, and that he has no authority to convey the title of any property clearly is of no benefit to the estate as a whole, but is mainly for the purpose of insuring the ultimate enforcement of the annuities. The whole burden of the fees claimed would fall on the State. Its interest in the property has, probably, already been reduced to small proportions, without reducing it further by the fees claimed herein. It is even possible, as far as can be judged now, that, after the taxes are paid, the whole of the estate will be consumed by the annuities. If so, Devine would in no way benefit by having an allowance of attorneys fees made to him now. Considering all the facts in this case, we cannot say that the trial court abused its discretion.

10. The court directed Underwood to make an accounting of his trusteeship. This was done at the request of Devine. It appears herein that he made various detailed written reports of his doings up to June 30, 1937. It would seem accordingly that to require him to do so again will merely entail further expense for the trust fund, and we think that this is unnecessary. If any of the interested parties herein

should deem the reports already made insufficient or inaccurate, they may, of course, make their objections, which would point out specifically what, if any, further report they desire, and the court may then, if the objection appears to be well taken, make such order as is proper.

Except as herein indicated, the judgment of the trial court is, accordingly, affirmed.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.